Ella HORNICK, Plaintiff-Appellant,

v.

Ruth NOYES, et al.,
Defendants-Appellees.

and

Ella HORNICK, Plaintiff-Appellant,

v.

YOUNG WOMEN'S CHRISTIAN ASSO-
CIATION OF MADISON, WISCON-
SIN, INC., Defendant-Appellee.

Nos. 81–1511, 81–2891.

United States Court of Appeals,
Seventh Circuit.

Submitted May 16, 1983.*

June 3, 1983.

As Amended June 7, 1983.

---

* After preliminary examination of the briefs in this consolidated appeal, the court notified the parties that it had tentatively decided that oral argument was unnecessary. The notice provided that any party could file a "Statement as to Need for Oral Argument." See Fed.R.App.P. 34(a); Circuit Rule 14(f). Appellant subse- quently filed such a statement. Appellee had previously filed a "Suggestion for Affirmance Without Oral Argument." After careful con- sideration of the parties' statements, the court has concluded that oral argument would not be helpful. Accordingly, the appeals have been submitted on the briefs and the record.

Ella Hornick, Madison, Wis., for plaintiff-appellant.

Roy L. Prange, Jr., Ross & Stevens, S.C., Madison, Wis., for defendants-appellees.

Before BAUER, ESCHBACH and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The tangled history of this case begins in March of 1972 when the pro se appellant Ella Hornick (now approximately seventy-five years of age) became a permanent resident of the Madison, Wisconsin YWCA and was assigned to a room on the fifth floor, one of the floors designated for elderly women. (The previous twenty years Mrs. Hornick spent as a resident of a state mental institution in Pennsylvania.) The record indicates that there was considerable friction among the residents of this floor, and numerous complaints about the appellant were made to the Resident Director, defendant Doris Hoopman. In response, the President of the Board of the YWCA, defendant Ruth Noyes, on February 3, 1976 informed the appellant that a meeting of the staff and floor residents would be held on February 13, 1976 for the purpose of discussing these problems. The appellant declined to attend.[1] On February 13, 1976 the YWCA, through its Executive Director (defendant Gertrude Ramey), and Board President Noyes decided that the appellant's residency should be terminated. Accordingly, a letter was sent February 23, 1976 directing the appellant to vacate the premises of the Y on or before March 31, 1976 (appropriate notice for a month-to-month tenancy). On March 10, 1976, the appellant filed a complaint with the Madison Equal Opportunities Commission (EOC) against the Y, alleging that her pending eviction was motivated by anti-semitism.[2] A representative of the EOC arranged to visit with Hornick and the staff at the Y on March 30, 1976 to see if a conciliation could be effected, and to interview other residents in order to investigate the charges. The appellant declined to participate. Instead, she filed a state court suit on that date seeking to enjoin the Y from terminating her residency. On April 7, 1976 the Y filed an eviction action. (The state court ultimately concluded that Mrs. Hornick's tenancy was yearly; a new eviction petition was filed March 14, 1977, and the appellant was evicted by the sheriff on June 14, 1978.)

On May 10, 1976 the appellant filed suit, amended July 19, 1976, in federal district court against Noyes, Ramey, Hoopman, and the YWCA seeking injunctive and mone-

1. She testified at trial that the meeting conflicted with her Federal Jurisdiction class at the University of Wisconsin Law School.

2. Appellant, a baptised Lutheran, is of Russian Jewish parentage. She considers herself to be ethnically Jewish, and residents of the Y apparently categorized her as Jewish. (While there was originally some claim of discrimination based on national origin, this was dropped during the trial and is not at issue on appeal.)

tary relief under 42 U.S.C. §§ 1983, 1985 and 1986. The complaint was dismissed on March 21, 1978 by Judge Doyle for failure to show the state action necessary for a claim under these statutes. We affirmed, with an unpublished order dated June 24, 1980, but remanded to the district court in order that the court might determine whether the pro se complaint, liberally construed, stated a cause of action under the public accommodations title (Title II) of the Civil Rights Act of 1964, 42 U.S.C. § 2000a.[3] We also noted that to prevail on such a claim, the appellant would have to demonstrate that she had in fact met the procedural prerequisites of § 2000a–3(c) prior to filing the suit. On remand, Judge Doyle found that the appellant's EOC complaint had been filed only against the Y; accordingly he dismissed the suit as to the three individual defendants. The appellant promptly appealed the decision; this appeal is No. 81–1511. In October of 1981, a seven-day bench trial was held before Judge

Doyle with the Y as the only defendant. The appellant was represented by appointed counsel who presented twenty-four witnesses and numerous exhibits. Judge Doyle concluded that the appellant's eviction was not the result of religious discrimination within the meaning of § 2000a.[4] The plaintiff promptly appealed that adverse decision; this is appeal No. 81–2891. We have consolidated these two pro se appeals for consideration today.[5]

## I. No. 82–1511.

■ As directed by this court in its order of remand of June 24, 1980, 624 F.2d 1106 Judge Doyle had to determine whether the appellant had met the procedural requirements of § 2000a–3(c)[6] prior to the filing of her July, 1976 amended complaint. He found that the complaint filed March 10, 1976 with the Madison EOC[7] named only the YWCA as the party complained against; no other respondent was listed. In the narrative portion of the complaint form (Item

3. Section 2000a states in pertinent part:
   (a) *Equal Access:* All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation ... without discrimination or segregation on the ground of race, color, religion, or national origin.

4. There was also some contention at trial, not pressed on appeal, that the eviction suit was filed in retaliation for the appellant's filing of the complaint before the EOC, retaliation proscribed by 42 U.S.C. § 2000a–2. The district court found that while the March 10, 1976 EOC complaint preceded the April 10, 1976 eviction action, the Y had decided to evict the appellant on February 13, 1976, and had merely persisted in its original decision—and continued to do so up until June 14, 1978 when it was finally successful.

5. The history of this litigation is also replete with motions for rehearing, attempts to remove state proceedings to federal court, attempted appeals to the United States and Wisconsin Supreme Courts, and petitions for writ of mandamus, etc. The appellant has also made numerous attempts to disqualify Judge Doyle, and one of her chief contentions on appeal is that she was deprived of a fair trial because of Judge Doyle's "bias and personal animus towards her." That argument is absolutely without merit. It is apparent from a careful review of the transcripts of the seven-day trial and the various pretrial conferences that Judge Doyle

took great care to make sure that the appellant had every opportunity to present her claim. We commend him for his handling of a very trying case.

6. Section 2000a–3(c) provides in pertinent part:
   *Notification of State or local authority.* In the case of an alleged act or practice prohibited by this subchapter which occurs in a State, or political subdivision of a State, which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no civil action may be brought ... before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority ....

7. The Madison Equal Opportunities Commission is an agency that fits the requirements of § 2000a–3(c). See Madison General Ordinances § 3.23(10), (14) (1975). The Commission is authorized to investigate, and to seek conciliation. If unsuccessful, the Commission, which has subpoena powers, may convene a hearing; the parties may be represented by counsel and testimony is under oath. If respondent does not comply with any resulting order, the case can be forwarded to the City Attorney for prosecution.

5. "Explain What Unfair Thing Was Done"), defendants Noyes, Ramey and Hoopman were described as the YWCA agents who committed the allegedly unlawful acts. The district judge concluded that mere narrative mention of the actions of the respondent's agents was not sufficient to make those individuals respondents within the purview of § 2000a–3(c). We agree. The individual defendants were properly dismissed.

■ We also note that under Title II, only injunctive relief is available to a prevailing plaintiff. See *Newman v. Piggie Park Enterprises,* 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). Should Mrs. Hornick prevail against the YWCA, which can act only through its agents, the Y would be ordered to reinstate her; no additional relief is available and no purpose is served by suing the individuals in addition to the YWCA. The case against the three individuals is in any event moot; all three are no longer associated with the Madison Y. Any injunction that might issue in Case No. 82–2891 would enjoin the Y and its present and future agents, whoever they might be. In an action for reinstatement in the Madison Y, a suit against individuals not associated with the Y is simply meaningless. The judgment in Case No. 81–1511 is AFFIRMED.

## II. No. 82–2891.

After the trial, Judge Doyle found that several of the elderly ladies on the fifth floor were anti-semitic, as was the Assistant Resident Director (not a defendant, and not one of the Y decision makers). The judge further found that some of the residents' complaints about Mrs. Hornick could well have been prompted by anti-semitism. Nevertheless, he found that the three decision makers, Noyes, Ramey and Hoopman, were themselves not motivated by anti-semitism (if indeed they even had knowledge that Mrs. Hornick was of Jewish origin), and that they had clearly articulated and set forth a nondiscriminatory reason (the necessity of maintaining a harmonious residential program for women, many of whom had psychiatric or physical problems, who

were unable to live by themselves) for seeking the appellant's eviction. The appellant countered at trial that these decision makers knew or should have known of the anti-semitic basis for the residents' complaints. In rejecting this argument, the district judge placed particular stress on the fact that the decision makers had arranged two formal meetings at which the appellant could have apprised them of the anti-semitism problem, if in fact any existed, and that on each occasion she had refused to participate. He concluded that the Y management had thereby sufficiently discharged any duty of inquiry that it might have had into the motivations of the complainants. Thus, in the absence of any evidence of anti-semitism on the part of the Y management, the Y could not be held liable under Title II.

This case thus presents a novel question under Title II, namely, the extent to which Title II liability can be premised on religious prejudice somewhere in the causal sequence of events that leads to eviction, but on the part of persons other than the decision makers. It speaks well for this society that there is a paucity of Title II litigation, but we are faced with an absence of precedent on this point to aid in deciding this case. A preliminary question, then, is the theory under which this case should be evaluated.

It is clear that the YWCA is a place of public accommodation for purposes of Title II. See, *e.g., Nesmith v. YMCA,* 397 F.2d 96 (4th Cir.1968); *Stout v. YMCA,* 404 F.2d 687 (5th Cir.1968). Nevertheless, the residential situation at the Madison YWCA does not seem to be the type of public accommodation contemplated by § 2000a. In the paradigmatic Title II case, the only personal interaction, and consequently the only locus of discrimination, is the "vertical" interaction between the proprietor of the motel, theater or restaurant (or his agent) who refuses to permit a minority traveler or patron to make use of the facilities; any allegedly discriminatory behavior is on the part of the defendant proprietor (or his agents, for whom he is responsible).

The prejudices of other individuals are not at issue—except in those cases in which the proprietor discriminates in order to avoid antagonizing white customers. See, *e.g., United States by Katzenbach v. Gulf-State Theaters, Inc.,* 256 F.Supp. 549 (D.Miss. 1966). Even in this fact situation, however, it is the defendant proprietor who makes the discriminatory decision "on the grounds of race, color, religion or national origin"— even if he is personally without prejudice and makes his decision for what he considers to be sound business reasons.

In contrast, the situation at the Madison YWCA involves substantial "horizontal" interactions among long-term residents. In addressing this Title II oddity, Judge Doyle suggested that the situation might be more analogous to a Title VII employment case in which there are long-term "horizontal" relationships among employees as well as a hierarchical chain of command that separates the ultimate decision maker (*e.g.*, the personnel director) from, *e.g.*, the assembly line worker who is fired.[8] As the district judge posed the hypothetical question, suppose that assembly line workers, motivated by religious or racial prejudice, falsely complain about a co-worker's work or safety habits, and the information is passed up the chain of command until the worker is discharged. Does management have an obligation to inquire whether any bad conduct report, nondiscriminatory on its face, is actually false, and was initiated for discriminatory rea-

sons? The judge suggested that management would have no such obligation in the absence of some clear and specific claim (presumably raised by the worker who had received the bad conduct reports) that there was in fact discrimination afoot. While we of course do not decide such a Title VII case here, we agree that the courts cannot create a presumption (even a rebuttable one) that any firing or denial of public accommodation facilities is discriminatory—unless, that is, management is somehow put on notice that there may be a discrimination problem.[9]

Given that we conclude that the burdens of proof and production were correctly allocated, the only remaining question is whether the evidence supports the finding of no violation of § 2000a. In reviewing factual findings of the district court, we are bound by the "clearly erroneous" standard of Rule 52(a), Federal Rules of Civil Procedure. This rule rests in part on the district court's unique opportunity to view and weigh the testimony of the witnesses to assess their credibility. *Medtronic, Inc. v. Benda,* 689 F.2d 645, 647 (7th Cir.1983) (citing *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982)). In this case the evidence consists almost entirely of the testimony at trial of plaintiff, the Y staff members, and numerous other witnesses. We will reverse a decision based on witness credibility only if we are left with a "definite and firm conviction that a

---

**8.** Because of this similarity to the Title VII paradigm—as well as the absence of recent Title II precedent—this case was tried in accordance with the allocation of burdens and order of proof set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and clarified in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). See also *Lee v. National Can Corp.,* 699 F.2d 932 (7th Cir.1983). Under this standard, plaintiff has the burden of establishing by a preponderance of the evidence a prima facie case of discrimination (here, that Mrs. Hornick was a member of a protected class, that she was evicted, and that her room remained available for occupancy by others). The burden of production then shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions.

The burden shifts back to the plaintiff to prove that defendant's proffered reasons were pretextual. The ultimate burden of proving discrimination always, of course, rests on the plaintiff.

We agree that *Burdine* provides the best available guidance for handling a case of this sort.

**9.** Mrs. Hornick asserts that she had given such notice in 1974 when she sent on to Ruth Noyes a seating chart posted in the fifth floor kitchen which listed "the Jewish lady" and the "Philippino lady." The district court concluded that while this might be a tactless descriptive, it did not amount to an anti-semitic slur sufficient to put the Y management on notice of an anti-semitism problem. We do not find this assessment to be clearly erroneous.

mistake has been committed." *Id.* After a careful review of the record, we find no basis for questioning the district court's implicit credibility determinations, and conclude that the court's findings are not clearly erroneous. Accordingly, the judgment in Case No. 81–2891 is AFFIRMED.