The PEOPLE OF the STATE OF NEW YORK by Robert ABRAMS, the Attorney General of the State of New York, William Bell and Sharon Bell, Plaintiffs,

v.

The OCEAN CLUB, INC., Defendant.

CV 82–0790.

United States District Court, E.D. New York.

Sept. 11, 1984.

Lawrence S. Kahn and Alan D. Aviles, Asst. Attys. Gen., New York City, for plaintiffs.

Max Goldweber, Mineola, N.Y., for William Bell and Sharon Bell.

Albert A. Gaudelli, Flushing, N.Y., for defendant.

*Memorandum of Decision and Order*

MISHLER, District Judge.

The issues of fact were tried to a jury which rendered a special verdict. The jury failed to agree on the question as to whether The Ocean Club, Inc. was a private club. (1st question). On the other issues the jury found as follows:

2. Does The Ocean Club engage in a practice or policy of discriminating against Jewish guests or prospective guests or against Jewish applicants for membership?

·Yes ___ No _x_

3. Did Charles Williams, the manager of the club, on July 9, 1981 tell William Bell not to invite Jewish guests?

Yes _x_ No ___

4. Was it within the scope of the authority of Charles Williams to advise members not to invite Jewish guests?

Yes ___ No _x_

The court directed the Clerk to enter judgment in favor of the defendant and against the plaintiffs dismissing the complaint.

*The Motion by The People of the State of New York*

The court sustained objection to the testimony of Fred Lager, Mayor of Atlantic Beach, that was offered to show that The Ocean Club had a reputation for discriminating against Jewish applicants for membership or guests. The court also sustained objection to the introduction of statements made by Robert Kullman, Chairman of the Board of Governors of The Ocean Club, that the club was a "Christian club."

*Reputation Testimony*

At trial plaintiffs offered the reputation testimony under the hearsay exception of Rule 803(20) of the Federal Rules of Evidence. That rule refers to "[r]eputation in a community ... as to boundaries ... and as to events of general history...." The matter must be ancient "or one as to which it would be unlikely that living witnesses could be obtained...." 4 Weinstein's Evidence, p. 803–268.

■ Plaintiffs now cite district court cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* where reputation of discriminatory policies of the employer is admissible as evidence of why a member of the protected class failed to apply. *Equal Employment*

*Opportunity Commission v. Sheet Metal Workers, Local No. 122,* 463 F.Supp. 388, 426 (D.Md.1978); *U.S. v. Lee Wag Motor Freight,* 7 F.E.P. 712 (D.C.Okla.1973). Non-applicants are members of the protected class under Title VII. The evidence is admitted in such cases to show that the plaintiff would have applied but for the employer's reputation of a discriminatory policy. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 365–66, 97 S.Ct. 1843, 1869–70, 52 L.Ed.2d 396 (1977). The reputation evidence was offered to prove The Ocean Club's discriminatory practice and policy. It was inadmissible hearsay on that issue.

■ Plaintiff's counsel requested a ruling on whether he would be permitted to ask Kullman whether he had made statements that The Ocean Club was a "Christian Club." Such a question is inadmissible under Rule 804(b)(3).[1] However, even if the request extended to permission to use the prior statement, anticipated to be inconsistent with the testimony Kullman was about to give, the ruling would be the same. The admissibility of such statements is left to the trial court's discretion. *United States v. Oropeza,* 564 F.2d 316 (9th Cir.1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978) (Prior statement offered under Rule 804(b)(3)). The use of the term "Christian Club" in no way implies a discriminatory policy. Yet its use in the trial presented a danger of unfair prejudice while showing no support for plaintiff's contention that The Ocean Club had a practice and policy of discriminating against Jews. The potential unfair prejudice is underscored when considered with the testimony of Eugene Bechtle, an applicant for membership, who testified that Conrad Remling told him that The Ocean Club was a Christian beach club and that Jewish guests were not welcome. Kullman's proffered statement would probably have suggested the same discriminatory attitude as Remling's. *See Workman v. Cleveland,* 68 F.R.D. 562, 563 (N.D.Ohio

---

1. The exception under Rule 804(b)(3) refers to statements made by a declarant who is unavail-

able when the statement is "contrary to the declarant's pecuniary interest...."

1975) ("the rule requires a more definite showing of the declarant's awareness of the possibility of liability"—a ruling under Rule 804(b)(3)). Additionally, it is noted that plaintiffs offered testimony through Kullman (Tr. pp. 1346–1356) and Gloria Rogers (Tr. pp. 1537–38) that The Ocean Club was known as a "Christian beach club." The motion by The People of the State of New York for a new trial pursuant to Rule 59(a) is denied.

### Motion by William Bell and Sharon Bell

The Bells, who were members of The Ocean Club, claim a violation of Title II § 202 of the Civil Rights Act of 1964, 42 U.S.C. § 2000a,[2] § 296(2)(a) of the New York Executive Law (Human Rights Law)[3] and § 40 of the New York Civil Rights Law.[4] The claims are based on an incident that occurred at The Ocean Club on July 9, 1981. It is alleged that on that day, Charles Williams, The Ocean Club manager, upon learning that Bells' guests were Jewish, advised William Bell that The Ocean Club bars Jewish guests, does not admit Jews to membership; and that his Jewish guests should not return to the club (Complaint ¶¶ 16–18). The Bells claim that as a result of the discriminatory practice they resigned from the club and suffered humiliation, mental anguish and pain.

### Standing

The Ocean Club renews the challenge to the right of the Bells to maintain an action based on the alleged discriminatory practices directed at their guests. The court, in denying the club's motion for summary judgment, found the Bells had standing (*see* Memorandum of Decision and Order dated January 24, 1984) (citing *Association of Data Processing Service Org., Inc. v. Camp*, 397 U.S. 150, 153–54, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)); *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982); and *Fiedler v. Marumsco Christian School*, 631 F.2d 1144, 1149–50 (4th Cir. 1980). *See also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Halet v. Wend Inv. Co.*, 672 F.2d 1305 (9th Cir.1982); *Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548 (9th Cir.1980).

### Williams' Discriminatory Act Attributable to The Ocean Club

The court considers the motion to alter or amend the judgment as a motion to vacate the judgment dismissing the Bells' complaint. *See Huff v. Metropolitan Life Ins. Co.*, 675 F.2d 119, 122 (6th Cir.1982); *Smith v. Hudson*, 600 F.2d 60 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

The critical question presented to the court is whether the court should have disregarded the finding of the jury that the discriminatory act of Charles Williams was not within the scope of his authority (Question 4) and directed judgment for the Bells based on the finding that Charles Williams told William Bell not to invite Jewish guests (Question 3).

---

**2.** 42 U.S.C. § 2000a–1 provides in pertinent part:
All persons shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race, color, religion or national origin....

**3.** Section 296(2)(a) of the New York Executive Law provides in pertinent part:
It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color [or] national origin ... directly or indirectly, to refuse, withhold from or deny to such person any of the accommodation, advantages, facilities or privileges thereof....

**4.** Section 40 of the New York Civil Rights Law states in pertinent part:
All persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any places of public accommodations, resort or amusement, subject only to the conditions and limitations established by law and applicable alike to all persons. No person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any such place shall directly or indirectly refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof....

It is undisputed that Williams, who was the club manager for 35 years, had full and complete authority to make decisions for the club that related to the day-to-day management of the club. He had the duty and authority to enforce all the rules and regulations of the club. Furthermore, at times Williams substituted for a member of the membership committee in interviewing applicants. (Marone, Tr. p. 1148, Kullman, Tr. p. 1277).

Williams received complaints of members either directly or through his staff, which consisted of Mildred Wood, the social secretary and renting agent, and Gloria Rogers, the receptionist. Members were required to record the names of their guests with the receptionist in Williams' office. The incident of July 9, 1981 was triggered by Rogers' suspicion that Bells' guests were Jewish. When she passed it on to Wood, it was Williams who requested that William Bell come to the office to discuss the presence of Jewish guests.

In *Hornick v. Noyes*, 708 F.2d 321 (7th Cir.1983) the court was faced with "a novel question under Title II, namely, the extent to which Title II liability can be premised on religious prejudice somewhere in the causal sequence of events that lead to eviction, but on the part of persons other than the decision makers." *Id.* at 324. The trial court found that other residents of the public accommodation (a YWCA residence) and an assistant resident director discriminated on the basis of race and religion. The court pointed out "that the three *decision makers*, Noyes, Ramey and Hoopman, were themselves not motivated by antisemitism (if indeed they even had knowledge that Mrs. Hornick was of Jewish origin)." *Id.* at 324 (underscoring supplied). The court found that the plaintiff showed no violation of Title II by either the YWCA or the "decision makers." The opinion notes:

> In the paradigmatic Title II case the only personal interaction, and consequently the only locus of discrimination, is the 'vertical' interaction between the proprietor of the motel, theater or restaurant (or his agent) who refuses to permit a minority traveler or patron to make use of the facilities; any alleged discriminatory behavior is on the part of the defendant proprietor (or his agents for whom he is responsible).

*Id.* at 324. *See also Black v. Bonds*, 308 F.Supp. 774 (S.D.Ala.1969) (discriminatory acts of waitress are attributable to owner of restaurant under Title II even though the uncontradicted testimony shows that the waitress acted in defiance of the owner's instruction).

In *Hudson Transit Lines v. N.Y. St. Human Rights App. Bd.*, 47 N.Y.2d 971, 419 N.Y.S.2d 960, 393 N.E.2d 1033 (1979), the New York Court of Appeals held a carrier violated Executive Law § 296, subd. 2, when a bus driver discriminated against a passenger because of his American Indian ancestry, which act of discrimination was in contravention of the carrier's policy. *See also Totem Taxi v. N.Y. St. Human Rights App. Bd.*, 98 A.D.2d 923, 471 N.Y. S.2d 358 (3d Dep't 1983).

Employment discrimination cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, hold an employer liable for the discriminatory acts of employees who have authority over hiring, though committed without the knowledge or consent of the employer. *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 80 (3d Cir.1983) "[W]hen a supervisor who has plenary authority over hiring, discipline and dismissal makes an employment decision, that decision may be imputed to the employer.... It is widely recognized in racial discrimination cases that an employer is liable as a principal for Title VII violations." (citations omitted); *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir.1982) ("[A]n employer is strictly liable for sexual discrimination by supervisors ..."); *Calcote v. Texas Educational Foundation*, 578 F.2d 95, 98 (5th Cir.1978) (discriminatory acts of supervisor committed within the course of his duties are deliberate acts of the employer).

■ Defendant distinguishes Title II responsibility from that imposed on an em-

ployer under Title VII based on the definition of "employer" under Title VII. Under 42 U.S.C. § 2000e(b) the term "employer" includes "any agent of such a person." The phrase includes an agent of the employer in the class to be charged for violations of the act. *Jeanty v. McKay & Poague, Inc.*, 496 F.2d 1119, 1121 (7th Cir.1974) (agents liable for their own unlawful conduct, even though their actions were at the behest of the principal). It does not modify traditional concepts imposing liability on principals for the acts of agents. The section imposes liability on an agent within the scope of his authority for a disclosed principal.[5]

In cases charging racial discrimination in housing based on Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*, we find that the liability imposed under Title VII on an employer is similarly placed on the owner of housing. In *Phiffer v. Proud Parrot Motor Hotel, Inc., supra,* at 552, the court said:

> Defendants also point to a lack of any evidence that the desk clerk acted under any express instructions from Chow or anyone else in a management position at the Proud Parrot as a fatal omission in the Phiffer's case. Discriminatory conduct on the part of a rental agent is, however, attributable to the owner of a motel, apartment complex, or other public housing facility.

*See United States v. Youritan Construction Company,* 370 F.Supp. 643 (N.D. Cal.1973), *aff'd in part and reversed in part on other grounds,* 509 F.2d 623 (9th Cir.1975). "The duty of the owner of such a facility to obey the laws relating to racial discrimination is non-delegable." *Mar v. Rife,* 503 F.2d 735, 741 (6th Cir.1974) (citing *United States v. Youritan, supra,* with approval and holding it is not necessary that plaintiff prove that the discriminatory acts of the agent were "with the approval or at the direction of [the owner]"); *see also Northside Realty Associates, Inc. v.*

*United States,* 605 F.2d 1348, 1354 (5th Cir.1979).

■ Based on the foregoing review of cases, we find that the discriminatory act on July 9, 1981 of Williams in telling William Bell not to invite Jewish guests is the act of The Ocean Club as a matter of law.

*The Ocean Club is a Public Accommodation*

42 U.S.C. § 2000a(e) provides that the provisions of Title II "shall not apply to a private club...." In considering the issue of whether a club was private or public for Title II purposes, one court ruled as follows:

> In determining whether an establishment is in fact a private club, there is no single test. A number of variables must be examined in the light of the Act's clear purpose of protecting only 'the genuine privacy of private clubs ... whose membership is genuinely selective'.... 110 Cong.Rec. 13,697 (1964) (remarks of Senator Humphrey). The first factor is the size of the organization and the open-ended character of its membership rolls. Most private clubs have limited membership ... and easily articulated general admission standards..... As one commentator observed, 'Where there is a large membership or a policy of admission without any kind of investigation of the applicant, the logical conclusion is that membership is not selective....'

*Nesmith v. Young Men's Christian Ass'n of Raleigh, N.C.,* 397 F.2d 96, 101–02 (4th Cir.1968) (citations omitted).

New York Executive Law § 296, subd. 9, defining a place of public accommodation excludes from the definition of that term "any institution, club or place of accommodation which is in its nature distinctly private." *Power Squadrons v. N.Y. St. Human Rights App. Bd.,* 59 N.Y.2d 401, 412–13, 465 N.Y.S.2d 871, 876, 452 N.E.2d 1199,

---

**5.** An agent, acting within the scope of his authority for a disclosed principal, is not liable for breaching a contract, *City University of New York v. Finalco, Inc.,* 93 A.D.2d 792, 461 N.Y.

S.2d 830 (1st Dep't 1983), or for inducing a breach of contract, *Marcraft Recreation Corp. v. Frances Devlin Co.,* 459 F.Supp. 195 (S.D.N.Y. 1978).

1204 (1983) set out the factors for determining whether an accommodation is public or private as follows:

(1) has permanent machinery established to carefully screen applicants on any basis or no basis at all, i.e., membership is determined by subjective, not objective factors; (2) limits the use of facilities and the services of the organization to members and *bona fide* guests of members; (3) is controlled by the membership; (4) is non-profit and operated solely for the benefit and pleasure of the members; and (5) directs its publicity exclusively and only to members for their information and guidance.

In reviewing the pertinent factors in determining whether The Ocean Club is a private club or public accommodation, the facts stated are either undisputed or clearly established.

*The Screening Process*

The application for membership is uninformative. It seeks only the name and address of the applicant, the type of business, names of the immediate family and the listing of two club members as references.[6] No investigation is made of the applicant. An interview is conducted by one member of the membership committee or at times by Mr. Williams and/or Mrs. Wood, social secretary and renting agent. The interview did not probe into the background and character of the applicant, but rather explained the facility and services available to members. Sometimes applicants were admitted without any interview. The club failed to establish any eligibility standards, i.e., economic, social, geographical, professional. No applicant for membership was rejected. Since 1979 more than 100 applications were received and all were approved. At times applicants were given access to the club's facilities before interview. Though the membership application form requested the names of two club members as references, the club did not insist on naming members. Of 56 ap-

plications for membership in 1981 only 26 listed two names as references; 19 listed one name; and 11 applications failed to list any name as a reference. Of the 56 applications only five were supported by two sponsoring letters; 31 submitted one sponsoring letter; and 20 failed to submit any sponsoring letter.

The membership applications were approved at a meeting of the Board of Governors based on a report of the membership committee, which reported only that an application for membership was submitted. The members of the Board of Governors routinely approved the report of the membership committee and the applicants thereupon became members. The general membership is not advised of the pendency of applications. The members of the club meet the newly admitted members at a club function designed for that purpose.

*Control by the Membership*

The club consists of two classes of members: (1) Permanent members, known as owner members, who have paid for and own a share in the club. They have the right to vote for the club's Board of Governors and officers. (2) Associate members who pay a season's membership fee for a period beginning in May and expiring after Labor Day. Associate members are eligible to purchase an interest in the club and become owner members after two successive years as associate members. There is no requirement that they become owner members. Some associate members have enjoyed that status for more than ten years. There are approximately 175 owner members of the club. Prior to the summer season, there are no associate members. Some time in or about May of each year former associate members renew their application and are required to do nothing more than pay the fee assessed for the season. New applications for associate membership are also filed. Membership applications are given at the club's offices to prospective applicants on request.

---

**6.** The constitution and by-laws of The Ocean Club provided that an applicant be known to a member of the Board of Governors or at least two members of the membership committee and be sponsored in writing by at least two owner members in writing.

There are usually 100 to 150 associate members enjoying the facilities of the club.

### Solicitation of Membership

Since 1975 the club inserted advertisements in various weekly and monthly church bulletins of five parishes soliciting applications for membership. During the period 1975 to 1981 an advertisement for membership appeared in 120 editions of various church bulletins.[7] The club also inserted two advertisements in the New York Athletic Club publication, Winged Foot, in 1979. The publication is distributed to approximately 9500 members.[8]

### Public Use of the Tennis Courts

In October 1965, the club acquired land upon which public tennis courts had been operating, which land is contiguous to the land that the club owned and operated as the beach club. The prior owner of the land on which the tennis courts were used continued to operate them as a public facility under a lease agreement with the club. The club entered into a lease agreement as of April 15, 1981 with a successor operator. The lease agreement provides that the club share the cost of reconditioning the five tennis courts equally with the lessee:

> It is understood that you will be responsible to The Ocean Club Tennis Committee, Joe Chester, Chairman, for all matters concerning the operation, maintenance of the tennis courts, including court rental fees, exclusive time for Ocean Club members of the tennis courts, etc., during the term of this agreement. In the event of any resolved [sic] dispute between you and the Tennis Committee, the matter will be referred to the Officers of The Ocean Club for final settlement and resolution.

■ In summary: (1) Membership in the club is extended to a large indefinite segment of the public without any standards of eligibility. There is no plan or purpose of exclusivity. (2) Associate members, constituting almost half the membership, have no voice in the control of the club. They are only members of the general public who pay a seasonal fee for the use of the club's facilities as they might at any public accommodation. (3) The policy of soliciting members in church bulletins and the N.Y. A.C. publication is an invitation to a large segment of the public without any requirements that might indicate exclusivity. (4) The tennis courts advertised and used by the membership and the operation of which is closely supervised and controlled by the club is offered for use by the general public. Thus, I find as a matter of law that The Ocean Club is not a private club but a public accommodation.

### Damages

The jury did not reach the issue of damages. At this point the Bells limit their claim for money damages to the statutory penalty provided in § 41 of the New York Civil Rights Law, i.e., not less than $100 or more than $500.

■ Damages are presumed when a valuable federal right is violated. *Williams v. Trans World Airlines*, 660 F.2d 1267, 1272 (8th Cir.1981); *Wayne v. Venable*, 260 F. 64, 66 (8th Cir.1919). The court may borrow from the state's measure of damages in considering the violation of a federal right. *Sullivan v. Little Hunting Park*, 396 U.S. 229, 239–40, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969).

■ The court finds that William Bell is entitled to recover the sum of $500 and Sharon Bell is entitled to recover the sum of $500 from the defendant The Ocean Club, Inc.

Since the jury found that The Ocean Club did not engage in a practice or policy of

---

**7.** A typical advertisement in a church bulletin said:

Enjoy All Summer For
Less Than a Resort
Week Costs
Pool—Tennis—Ocean Bathing

**8.** The advertisement announced

Your N.Y.A.C. Membership
entitles you to
Be Our Guest For a Day
at The Ocean Club
Ocean Bathing, Large Pool,
Kiddie Pool, Tennis

discriminating against Jewish guests or applicants, it follows that there is no likelihood of a repetition of the violation of Bells' rights. The application for injunctive relief is therefore denied.

ORDER

The judgment entered June 21, 1984 is vacated.

The Clerk is directed to enter a judgment in favor of the defendant, The Ocean Club, Inc., dismissing the claim of plaintiff, The People of the State of New York, and in favor of the plaintiffs William Bell and Sharon Bell in the amount of $500 each against the defendant The Ocean Club, Inc. and awarding attorney's fees to be fixed upon application of the Bells upon the judgment becoming final.

SO ORDERED.