Maryline LAROCHE, et al., Plaintiffs,

v.

DENNY'S, INC., et al., Defendants.

No. 98–0654–CIV.

United States District Court,
S.D. Florida.

July 26, 1999.

Robert E. Weisberg, Kimberly A. McCoy, Law Offices of Robert E. Weisberg, Coral Gables, Leslie W. Langbein, Langbein & Langbein, P.A., Aventura, FL, for Plaintiffs.

Jon K. Stage, Akerman, Senterfitt & Eidson, P.A., Fort Lauderdale, FL, for Defendants.

## AMENDED ORDER ON MOTION FOR SUMMARY JUDGMENT

SEITZ, District Judge.

THIS CAUSE came before the Court upon the Defendants' Motion for Summary Judgment, filed February 3, 1999 [D.E. No. 60]. Oral argument on the motion was held on April 16, 1999. Based upon the arguments of counsel, the undisputed material facts, pertinent case law, and the record, the Court shall grant partial summary judgment in favor of the Defendants.

### BACKGROUND

This is a case of race discrimination brought under Title II of the Civil Rights Act of 1964 for discrimination in public accommodation; 42 U.S.C. § 1981 for denial of the right to contract for or enjoy services; and the Florida Civil Rights Act, Ch. 760, Florida Statutes. Specifically, the Plaintiffs allege that the manager at the Denny's restaurant located at 8000 S.W. 8th Street in Miami, Florida, refused to serve the Plaintiffs on December 19, 1997, and January 2, 1998, because of their race.

### SUMMARY OF UNDISPUTED MATERIAL FACTS

The Court finds that the following material facts are not in dispute:

1. Plaintiffs Wright, Kendrick, Fortner, LaRoche, Channer, and Clinch are African–American. Plaintiffs Waters, Carpenter, and Tulino are White.

2. On December 19, 1997, Plaintiffs Wright, Kendrick, and Fortner visited the 8th Street Denny's with Officer Brown (who is also African–American but is not a Plaintiff) sometime after midnight (i.e., the morning of December 20, 1997). When they arrived, other customers were already seated and eating. The host (Jean Ketner—Haitian) informed the Plaintiffs that the stove was broken. Mr. Ketner was speaking at the direction of the manager (Carlos Ibarra—Hispanic). At the time of this statement, Mr. Ketner was holding three menus, ready to seat the Plaintiffs. Officer Brown asked Mr. Ibarra what cold food was available, and was informed again that the stove was broken. The Plaintiffs then left. It is undisputed that the stove was not broken on that date. There is no evidence that Wright, Kendrick, and Fortner were actually refused service. Also, the Plaintiffs have no evidence as to whether other patrons (of any race) were also "turned away," nor do they recall the racial composition of the patrons already seated. Other than the statement about the stove, no other employee of Denny's did or said anything to Plaintiffs of a discriminatory nature. The Plaintiffs just believe they were discriminated against because of their race.

3. On January 2, 1998, at approximately 12:30 a.m., Plaintiffs LaRoche, Waters, Carpenter, Kendrick, Tulino, Channer, Fortner, Wright, and Clinch entered the 8th Street Denny's. After the Plaintiffs entered, Mr. Ketner informed them that the restaurant was out of food, or certain food items. Mr. Ibarra joined in the dis-

cussion between Mr. Ketner and one of the Plaintiffs, and reiterated that there was a shortage of food. Mr. Ibarra then said to Plaintiffs Fortner and Tulino that "You guys don't look right together. You need to leave." There is a dispute as to whether the Plaintiffs had become hostile before this statement was made. Mr. Ibarra then told all the Plaintiffs to leave because the restaurant was closing. After the Plaintiffs left, Mr. Ibarra locked the door. While still in the parking lot, Plaintiffs observed some other customers (allegedly white) being allowed into the restaurant. Plaintiff LaRoche then called the restaurant on a cellular phone and learned that the restaurant was in fact open. On that same evening, African–American customers were served both before and after the incident with Plaintiffs; however, at the time of the incident, the Plaintiffs did not observe any other African–American customers in the restaurant. At the time in question, Denny's was actually out of some foods.[1]

4. The December 19, 1997, and January 2, 1998, incidents are the only incidents of alleged discrimination the Plaintiffs experienced at the 8th Street Denny's or any other Denny's.

5. Plaintiff LaRoche had eaten at the 8th Street Denny's at least twice before the January 2, 1998, incident.

6. Plaintiff Wright had eaten at the 8th Street Denny's at least once prior to December 19, 1997.

7. Plaintiff Kendrick had eaten "plenty of times" at the 8th Street Denny's prior to the dates in question.

8. Plaintiff Fortner had eaten at the 8th Street Denny's about six times prior to the January 2, 1998, incident, including as part of a mixed-race group.

9. All of the Plaintiffs had eaten at other Denny's locations numerous times prior to the incidents in question, without ever being mistreated. Some of the Plaintiffs have eaten at other Denny's locations since the incidents in question, again without ever being mistreated. None of the Plaintiffs have returned to the 8th Street Denny's since the January 2, 1998, incident.

10. Denny' maintains a policy, articulated in its Restaurant Management Handbook, against denial of service or other discrimination against customers on the basis of race. This policy is reinforced in Denny's management training program.

11. Other Denny's employees at the 8th Street restaurant testified that Mr. Ibarra would lock doors to regulate the flow of customers when he thought the restaurant was too busy. On January 2, 1998, Mr. Ibarra instructed Mr. Ketner to lock the doors after every third or fourth party and wait about 30 minutes before unlocking them. Mr. Ibarra later denied this action.

12. Denny's does not allow managers to lock doors during hours of operation. Following the January 2, 1998, incident, Mr. Ibarra was fired for violation of this company policy. Mr. Ibarra had only been at that location for three months at the time he was fired.

## STANDARD OF REVIEW

In deciding a summary judgment motion, the Court must apply the standard set forth in *Fed.R.Civ.P.* 56(c), which states in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

1. Although there is some dispute as to whether the Plaintiffs were actually seated when they first entered the restaurant, and as to the content of and the speakers involved in the subsequent telephone conversation, these disputes are neither relevant nor material to a resolution of the summary judgment motion. The only issue relevant here is whether the Plaintiffs were ultimately denied service because of their race.

moving party is entitled to a judgment as a matter of law.

The party seeking summary judgment always bears the initial burden of demonstrating that there is no genuine dispute as to any material fact in the case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

After the moving party has met this initial burden, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56(e), however, does not permit the nonmoving party to avoid summary judgment by resting on the pleadings, but "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Moreover, "[t]he mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## *ANALYSIS*

In their summary judgment motion, the Defendants raise three critical issues: (1) whether the Plaintiffs can establish a violation of the statutes in question; (2) if so, whether Defendants are liable for those violations; and (3) if so, whether the Plaintiffs can recover damages and/or injunctive relief for those violations. The Court shall address each issue in turn.

1. *The Discrimination Claims.*

█ Public accommodation and Section 1981 claims, as well as claims under the Florida Civil Rights Act, apply the same prima facie standards and burdens of proof as do employment discrimination claims under Title VII. *See, e.g., Hornick v. Noyes,* 708 F.2d 321, 325 n. 8 (7th Cir.1983), *cert. denied,* 465 U.S. 1031, 104 S.Ct. 1295, 79 L.Ed.2d 696 (1984)(Title II case); *Peterson v. BMI Refractories,* 132 F.3d 1405, 1412 (11th Cir.199)(Section 1981 case); *Kelly v. K.D. Constr. of Fla., Inc.,* 866 F.Supp. 1406, 1411 (S.D.Fla. 1994)(FCRA case). Thus, in order to succeed on such claims, the Plaintiffs must show the following elements:

(1) That they are members of a protected class;

(2) That they attempted to afford themselves the full benefits and enjoyment of a public accommodation;

(3) That they were denied those benefits and enjoyment; and

(4) That similarly situated persons who are not members of the protected class received the full benefits or enjoyment or were treated better.

*United States v. Lansdowne Swim Club,* 894 F.2d 83, 88 (3d Cir.1990). Once a prima facie case is established, the burden of persuasion shifts to the Defendants to proffer a legitimate business reason for the conduct at issue. The Plaintiffs cannot prevail unless they can demonstrate that the proffered reason is pretextual. *See Hornick,* 708 F.2d at 325 n. 8.

█ It is undisputed that the Plaintiffs meet the first two elements of their prima facie case. In their summary judgment motion, however, Defendants contend that Plaintiffs have not shown the last two elements, to wit: that they were deprived of equal use of the Defendants' eating establishment and that the denial of use was, in fact, done with discriminatory motive.[2]

---

**2.** Plaintiffs assert that, under Title II, they do not have to show intentional discrimination in order to prevail, citing *Watson v. Fraternal Order of Eagles,* 915 F.2d 235 (6th Cir.1990). In *Watson,* the court, in comparing Title II with Section 1981, made a generalized state-ment (without citing any authority) that "a plaintiff suing under the 1964 Civil Rights Act need not prove that the defendant's actions were intentional." This dicta, however, ignores the fact that a disparate treatment claim under Title VII of the Civil Rights Act of

Defendants further contend that, in any event, they have proffered legitimate, non-discriminatory reasons behind the events in question, and that the Plaintiffs have not disproved those reasons. In resolving these contentions, the Court shall address each event separately.

### a. The December 19, 1997, incident.

█ Based upon the undisputed material facts surrounding the December 1997 incident, the Court finds no inference of racial animus sufficient to allow this incident to proceed to trial. Specifically, there is no evidence (and the Plaintiffs have essentially conceded as much) that Plaintiffs Wright, Kendrick and Fortner were ever actually denied service. Other than being told that the stove was broken (when it actually wasn't, and after which statement the Plaintiffs turned around and left the restaurant), there is no evidence that an employee of Denny's said or did anything of a discriminatory nature. The Plaintiffs just "believe" that the single statement about the stove was made because of their race. The law is clear, however, that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment. *See, e.g., Local No. 48, United Bhd. of Carpenters & Joiners v. United Bhd. of Carpenters & Joiners*, 920 F.2d 1047 (1st Cir.1990)(holding that summary judgment should be granted where the non-moving party rests merely upon conclusory allegations and unsupported speculation).

In addition, there is no evidence in the record as to the racial composition of those patrons already seated in the restaurant or as to whether any other patrons besides the Plaintiffs were turned away. Hence, the Plaintiffs cannot show that "similarly situated persons who are not members of the protected class received the full benefits or enjoyment or were treated better." *Lansdowne Swim Club*, 894 F.2d at 88. Because the Plaintiffs cannot establish a prima facie case with respect to the December 19, 1997, incident, the Court finds that summary judgment in favor of the Defendants is warranted as to that event.

### b. The January 2, 1998, incident.

█ At the outset, the Court finds that the facts surrounding the January 1998 incident are more telling of possible racial discrimination. Specifically, taking the facts in the light most favorable to the Plaintiffs, the Plaintiffs were refused service on the night of January 2, 1998, and, at the time they were refused service, there were no other African–American patrons in the restaurant.[3] After they were asked to leave, white patrons were allowed into the restaurant and seated. Based on these facts, the Plaintiffs have met their prima facie case as to that incident.[4]

---

1964 requires a showing of discriminatory animus. Further, the clear language of Title II itself speaks in terms of disparate treatment (as opposed to disparate impact, for which intent is not an element). *See Arguello v. Conoco, Inc.*, 1997 WL 446433 at · *2 (N.D.Tex. July 21, 1997)(stating that the statutory language of Title II "evidences an intent to prohibit only intentional discrimination.... No court has recognized a disparate impact claim under Title II."). Because Title VII disparate treatment analysis applies in Title II cases, this Court concludes that intent is an element of a Title II claim. Other courts appear to have implicitly reached this same conclusion. *See, e.g., Jones v. City of Boston*, 738 F.Supp. 604 (D.Mass.1990)(holding that the hotel bartender's racial epithet of "nigger" shows an intent to discriminate on the basis of race and thus satisfies the plaintiff's

burden under Section 1981 and Title II); *Harrison v. Denny's Restaurant, Inc.*, 1997 WL 227963 (N.D.Cal. Apr.24, 1997)(holding that summary judgment on Title II claim warranted where the plaintiff had not established a prima facie case of intentional discrimination on the Section 1981 claim).

3. It is undisputed, however, that other African American patrons were, in fact, served both before and after the incident in question.

4. The Court notes that the group of Plaintiffs asserting claims for the January 2, 1998, incident includes white Plaintiffs. Such a fact, however, does not deprive those Plaintiffs of a cause of action. Indeed, Section 1981 and the civil rights laws have been interpreted broadly to hold that discrimination on the

Defendants have proffered a variety of reasons for the conduct by its manager on January 2, 1998. The facts establish, however, that the Plaintiffs were ultimately requested to leave the restaurant because they "didn't look right together." The Court finds that this statement casts sufficient doubt—albeit weakly—on the reasons proffered by the Defendants so as to survive summary judgment. *See, e.g., Combs v. Plantation Patterns,* 106 F.3d 1519 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998)(holding that a jury question is created when the prima facie case is coupled with evidence sufficient to permit a reasonable fact-finder to disbelieve the defendant's proffered reasons for the challenged action). Accordingly, the Court must determine whether the Defendants can be held liable for such conduct.

## 2. *The Respondeat Superior Liability Issue.*

Defendants argue that the manager and server accused of the discriminatory conduct acted outside the scope of their authority and, therefore, Defendants are not vicariously liable for that conduct. Specifically, the Defendants have an explicit written policy against the denial of service based on race, and against locking the front doors during the normal hours of operation. Thus, Defendants contend, to the extent their employees violate these well-established, explicit rules, they act outside the scope of their authority and Defendants cannot be held liable for that wrongful conduct.

Pursuant to Section 219(1) of the Restatement (Second) of Agency, an employer will always be held liable for the torts of its employees committed while acting in the scope of their employment. If the employee acts outside the scope of their employment, however, the employer may still be held liable if one of the following four conditions is met:

> (a) the employer intended the conduct or the consequences;
>
> (b) the employer was negligent or reckless;
>
> (c) the conduct violated a non-delegable duty of the employer; or
>
> (d) the employee purported to act or speak on behalf of the employer and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relationship.

Restmt. (2d) Agency, § 219(2).

One district court has recently applied these traditional agency principles in a Title II context to hold an employer not liable for the acts of its employee in mistreating customers. *See Arguello v. Conoco, Inc.,* 1998 WL 713277 (N.D.Tex. Oct.7, 1998). In *Arguello,* the plaintiffs—African-American customers at one of the defendant's gas stations—tried to purchase gas with a credit card. The cashier requested identification in order to accept the credit card. One of the plaintiffs, a resident of Oklahoma, produced her Oklahoma driver's license. The cashier refused to accept out-of-state identification, stating it was company policy. Ultimately, the plaintiffs were allowed to use their credit card. However, as they were signing the receipt, the cashier began yelling racial obscenities at them. As they left the store, the cashier yelled further racial obscenities over the loudspeaker and made obscene gestures. 1998 WL 713277 at *1. When the defendant learned of the conduct, the cashier was transferred to another store. The plaintiffs thereafter brought suit under 42 U.S.C. § 1981 and under Title II, 42 U.S.C. § 2000a. *Id.* at *2.

---

basis of interracial association is actionable. *See Parr v. Woodmen of the World Life Ins. Co.,* 791 F.2d 888, 892 (11th Cir.1986). Moreover, the Supreme Court has explicitly held that the refusal of a restaurant to serve a white woman because she was in the company of African–Americans violates Title II. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 n. 5, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The court in *Arguello,* following the Supreme Court's guidance in *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), applied the common law of agency in determining the defendant's liability for the cashier's discriminatory conduct and held the defendant not liable. *Id.* at *6. The court reasoned that the only evidence proffered by the plaintiffs was that the employee was working in her capacity as cashier when she made the offensive remarks and gestures, and that the employee "claimed" that it was her "duty" to refuse an out-of-state driver's license as identification. *Id.* at *7. The plaintiffs, however, provided no evidence establishing the defendant's corporate policies as to the acceptance of credit cards or requests for identification. The plaintiffs also failed to provide any evidence establishing that the employee was under the impression that her behavior would somehow benefit her employer. The court therefore concluded that the cashier was acting outside the scope of her employment, and the defendant was entitled to summary judgment in its favor. *Id.* The court also noted that the plaintiffs offered no evidence indicating that the defendant intended for the cashier to act in the way she did, that the defendant itself was reckless or negligent, that the cashier was aided in accomplishing the tort by the existence of her relationship with the defendant, or that the defendant in any way ratified the wrongful conduct. *Id.*

■ In the instant case, it is clear that Ibarra acted outside the scope of his employment. Specifically, it is undisputed that his actions on January 2, 1998, violated explicit company policies prohibiting such conduct. Thus, Defendants can only be held liable for that conduct if one of the four conditions under Section 219(2) of the Restatement (Second) of Agency are met. Here, no evidence has been presented showing that the Defendants intended the conduct or its consequences; that the Defendants themselves were negligent, or reckless; or that the wrongful conduct violated a non-delegable duty of the Defendants. Thus, the only remaining prong upon which Plaintiffs can rely is Section 219(2)(d) of the Restatement: that Ibarra was aided in accomplishing the tort by the existence of the agency relationship.

Under Section 219(2)(d), "[l]iability is based upon the fact that the agent's position facilitates the consummation of the [tort], in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." *Gary v. Long,* 59 F.3d 1391, 1397 (D.C.Cir.), *cert. denied,* 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995). The third person's viewpoint, however, must be reasonable. "If a person has information which would lead a reasonable man to believe that the agent is violating the orders of the principal or that the principal would not wish the agent to act under the circumstances known to the agent, he cannot subject the principal to liability." Restatement § 166 cmt. a. *See also Bouton v. BMW of N. Am., Inc.,* 29 F.3d 103, 108–09 (3d Cir.1994). The commentary to the Restatement provides, by way of examples, that a telegraph company may be held liable for a tort committed by a telegraph operator who sends a false telegraph message, as may the undisclosed principal of a store whose manager cheats a customer. Rstmt. § 219 cmt. e. In *Costos v. Coconut Island Corp.,* 137 F.3d 46, 47 (1st Cir.1998), the owner and corporate manager of an inn were held liable for the inn manager's rape of a guest, and the district court denied the defendants' motion for judgment as a matter of law. The appellate court affirmed, reasoning that "By virtue of his agency relationship with the defendants, as manager of the inn, Bonney was entrusted with the keys to the rooms, including Costos' room, at the Bernard House. Because he was the manager of the inn, Bonney knew exactly where to find Costos. The jury could find that Bonney had responsibilities to be at the inn or to have others there late at night." *Id.* at 50.

The evidence here shows that Ibarra, at the time of the January 2, 1998, incident, was acting in his capacity as manager of the 8th Street Denny's restaurant. In that respect, Ibarra was able to cause harm to the Plaintiffs (i.e., refuse to serve them, make remarks which could be interpreted as racially disparaging, require them to leave, and lock the doors behind them) solely by virtue of his position as manager. It is doubtful that, absent such apparent authority, the Plaintiffs would have acquiesced to Ibarra's demands. Thus, following the Restatement and the holding in *Costos*, the Court finds that Defendants' motion for summary judgment should be denied as to the January 2, 1998, incident.

### 3. *The Damages Issue.*

■ With respect to the relief available to the Plaintiffs for their claims, Defendants first argue that the Plaintiffs cannot meet the standards for an award of injunctive relief under Title II.[6] Specifically, in order for an injunction to issue, the Plaintiffs must show "a real or immediate threat that [they] will be wronged again— a 'likelihood of substantial and immediate irreparable injury.'" *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (citation omitted). The undisputed material facts establish that Ibarra is no longer an employee of the Defendants and that none of the Plaintiffs have returned to the 8th Street Denny's since the January 2, 1998, incident. It is further undisputed that, in all of their visits to a Denny's restaurant both before and after the incidents in question, none of the Plaintiffs had ever felt discriminated against. It therefore appears that the Plaintiffs' claim of future injury is speculative in nature. Moreover, Plaintiffs have

an adequate remedy at law to ensure their injuries, if any, will be recompensed—i.e., Section 1981. Hence, under *Lyons*, it seems unlikely that the Plaintiffs are entitled to injunctive relief. Nevertheless, this being an issue for the Court and not the jury, the Court shall reserve on the issue of injunctive relief until after the close of all the evidence at trial. Accordingly, Plaintiffs' Title II claim will not be dismissed.

■ Defendants next argue that the exclusivity provision of Title II bars the Plaintiffs from recovering damages under Section 1981. The Court disagrees. Title II provides, inter alia, that:

The remedies provided in this title shall be the exclusive means of enforcing the rights based on this title, *but nothing in this title shall preclude any individual ... from asserting any right based on any other Federal or State law not inconsistent with this title, ... or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right.*

Section 207(b), Title II, 42 U.S.C. § 2000a–6(b) (emphasis added). The Court finds that the clear language of the statute allows a plaintiff to maintain a Title II claim as well as a Section 1981 claim, even though the latter claim is based on the same set of facts as the Title II claim. In reaching this holding, the Court finds the Supreme Court's analysis in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), persuasive.

■ In *Adickes*, the Supreme Court addressed a claim of unequal treatment in public accommodation, brought as an equal protection claim under the Fourteenth Amendment through 42 U.S.C. § 1983.[7] 398 U.S. at 146, 90 S.Ct. 1598. In so

---

**6.** Although Defendants also argued that the Plaintiffs' claim for damages under Title II must be stricken, Plaintiffs have conceded that issue and have voluntarily dismissed their damages claim in that regard. *See* 42 U.S.C. § 2000a–3; *Newman v. Piggie Park Enters., Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

**7.** Section 1983 does not confer any substantive rights but rather, is a vehicle for "vindicating federal rights elsewhere conferred." *See Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).

doing, the Court recognized that a claim under Title II could not be brought through 42 U.S.C. § 1983 because "Congress did not intend that violations of the Public Accommodations Title be enforced through the damages provisions of § 1983." *Id.* at 150 n. 5, 90 S.Ct. 1598. The Court further stated, however, that "[i]n any event, we think it clear that there can be recovery under § 1983 for conduct that violates the Fourteenth Amendment, even though the same conduct might also violate the Public Accommodations Title which itself neither provides a remedy nor can be the basis of a § 1983 action." *Id.* In making this determination, the Court relied upon the express terms of Section 207(b) of Title II. *Id.See also Watson v. Fraternal Order of Eagles,* 915 F.2d 235, 242 (6th Cir.1990). Based on this guidance from the Supreme Court, this Court holds that the Plaintiffs' claim for damages under Section 1981 is not barred by Section 207(b) of Title II.

## CONCLUSION

Based upon the foregoing analysis and authorities, and the undisputed material facts, it is hereby .

ORDERED that:

1. Defendants' Motion for Summary Judgment [D.E. No. 60] is GRANTED IN PART AND DENIED IN PART.

2. Plaintiffs' Motion to Strike Investigative Report of Clinton Case from Consideration as Evidence in Support of Defendants' Motion for Summary Judgment, filed March 12, 1999 [D.E. No. 96] is GRANTED.

3. Plaintiffs' Unopposed Motion to Permit Sur–Reply, filed April 15, 1999 [D.E. No. 127] is GRANTED.

4. Defendants' Request for Oral Argument, filed February 3, 1999 [D.E. No. 62], and Plaintiffs' Request for Oral Argument, filed March 12, 1999 [D.E. 95], are

GRANTED *nunc pro tunc,* as oral argument was held on April 16, 1999.