879 So.2d 121 (2004)
Merrilee G. ALBRIGHT, Julie M. Lafargue, Dolores George Lavigne, Ann Mathison McLaurin, and Jody L. Roberts
v.
SOUTHERN TRACE COUNTRY CLUB OF SHREVEPORT, INC. and Club Corporation of America.
No. 2003-C-3413.
Supreme Court of Louisiana.
July 6, 2004.
*123 Pettiette Armand, Dunkelman, Woodley, Byrd & Cronwell, Robert A. Dunkelman, Shreveport, for applicant.
Davidson, Jones & Summers, Allison A. Jones, Shreveport, Shannon L. Hicks, for respondent.
WEIMER, Justice.[1]
After carefully evaluating the facts of this particular case, we hold that women should not be excluded from dining with men in a public dining facility because such gender-based discrimination fails to pass constitutional muster under the provision of the Louisiana Bill of Rights entitled "Freedom from Discrimination."[2]
This year we mark the thirtieth anniversary of the enactment of the Louisiana Constitution of 1974, yet the instant case presents the first time this court is called upon to evaluate the constitutional provision that adds the force of law to the aspirational goal of avoiding arbitrary, capricious, or unreasonable gender-based discrimination in access to public facilities.
Four female members[3] of Southern Trace Country Club of Shreveport, Inc. (Southern Trace), which is owned by Club Corporation of USA (Club Corp), filed suit against those two entities seeking declaratory and injunctive relief. Plaintiffs challenged defendants' policy of restricting to adult men only the use of a dining area known as the "Men's Grille." Plaintiffs asserted this policy was facially discriminatory and in violation of Article I, § 12 of the Louisiana Constitution of 1974.
After trial on the merits, the district court ruled in favor of defendants. The court of appeal reversed, granting plaintiffs the relief sought.[4] Upon application by defendants, we granted a writ to determine whether the court of appeal used the proper standard of review and to resolve the issue of allocation of the burden of proof in a case of this nature.[5]
Just three years previous to the adoption by the people of Louisiana of the 1974 Constitution, the United States Supreme Court, for the first time in our nation's history, ruled in favor of a woman who complained that her state had denied her the equal protection of its laws.[6] The advances made by women during the 30 years since 1974 evidence the foresightedness of the Constitutional Convention in proposing the provision in La. Const. art. I, § 12 to assure freedom from arbitrary, *124 capricious, or unreasonable gender discrimination. For example, during that 30-year period, in 1981, the United States Supreme Court affirmed a judgment declaring the invalidity of the Louisiana law that made a husband the "head and master" of the community property and gave him the unilateral right to dispose of such property without his wife's consent.[7]
It has been acknowledged that our nation has had a long and unfortunate history of discrimination against women based on their gender.[8] It was not until the first quarter of the twentieth century, in 1920, that women in the United States were afforded the right to vote, a major step in removing women from the category of a disadvantaged group.
Despite the constitutional prohibition enacted in 1974, this case illustrates that gender-based discrimination in access to public places has not ceased. Arbitrary, capricious, or unreasonable denials of equal access to public establishments deprive those denied of personal dignity, inflicting a "stigmatizing injury" that is accompanied by a denial of equal opportunities.[9] In evaluating plaintiffs' case against Southern Trace, this court must be cognizant of the importance to individuals and society of removing the "barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women."[10] Further, those who are engaged in discriminatory practices are themselves deprived of the free exchange of different perspectives, beliefs, and ideas.

FACTUAL AND PROCEDURAL BACKGROUND
In 1984, William Harry Johnson Ramsey conceived the idea of a development consisting of a golf course, country club, and residential community in the Shreveport, Louisiana, area. Having played a considerable amount of competitive golf in his younger years, he visited from 15 to 20 clubs after the idea for Southern Trace germinated, studying the facilities to determine what he considered appropriate for the Shreveport market. He decided the market would support what he termed a "full blown" country club, which included swimming, tennis, and related facilities, instead of a golf-only club. The developers hired professional hospitality industry architects to design the facility. An interior design firm provided ratios of spaces, based on market demands, for the locker room facilities that would be built for the men as compared to the women's locker room.
Construction of the facility was completed in 1988 and Southern Trace opened for business that year. Pursuant to the plans *125 procured by Ramsey, the clubhouse featured a food service area adjacent to but separated by a hall from the men's locker room which was named the "Men's Grille," and a smaller food service area adjacent to but separate from the ladies' locker room named the "Ladies' Card Room." Both the men's and the ladies' locker rooms primarily served golfers and tennis players. The swimming pool had separate dressing rooms some distance from the clubhouse. In 2002, the only other eating area in the clubhouse was the Azalea Grille, which was apparently a dining area for both men and women. This description of the facilities is gleaned from the testimony and the documentary evidence. Inexplicably, there is no evidence, such as pictures or drawings, which depicts the physical layout of the various areas of the clubhouse. The trial judge toured the premises, but did not describe for the record what he viewed.
At the trial of this matter, Ramsey testified the idea for the Men's Grille was to have a place where the men could have a cocktail within their "locker room environment." The men's locker room has a steam room, a hot sauna, and a Jacuzzi, as well as a shower area. According to Ramsay, a man could use the Jacuzzi, put on a towel, and then go into the Men's Grille for a beer or a sandwich; this was done "all the time." This fact was verified when Brian Walsh testified that during his tenure as general manager at Southern Trace, he observed men in the Men's Grille who were "dressed in anything from a towel to nothing to golf attire." However, there are facilities in both locker rooms where the patrons could sit and have a drink or a sandwich within the locker rooms. Ramsey described four tables in the aisle of the men's locker room where the men sit around, having a beverage or lunch or playing cards. The female plaintiffs were asked whether they were seeking admittance to the men's locker rooms and they emphatically stated they were not.
The original developers owned Southern Trace for three years before selling to Club Corp, a parent corporation that owns approximately 200 club facilities in various states. Southern Trace has remained a separate corporation from Club Corp. Southern Trace has a Board of Directors, made up of persons hired by Club Corp, which can decide such matters as enforcement of the men-only policy at the Shreveport facility. However, no member of the Board of Directors is a member of the Shreveport country club or an employee of Southern Trace. The Board of Directors differs from the Board of Governors of Southern Trace, which is made up entirely of Southern Trace dues-paying members. The Board of Governors is a body that, upon the request of the general manager, will "advise and consult"; that body has no right or power to "direct, manage, supervise, or control" Southern Trace policy. The by-laws specifically provide that Southern Trace members do not have any voice in the management of the club operation except through the Board of Governors' action as an advice and consult body. Members do not participate in new member selection. At the time of trial, Ramsey was an ex officio member of the Board of Governors.
After the sale to Club Corp, Southern Trace was operated by a general manager hired by Club Corp. During the time period pertinent to this litigation, two general managers operated Southern Trace: Ron Minkler and Brian Walsh, the latter serving since July of 2000. Minkler, who was the general manager on Sunday, March 26, 2000, the date of the incident that triggered this lawsuit, testified he enforced the policy of not allowing female members into the Men's Grille, but he had no input into the formulation of that regulation. It *126 was a rule he inherited, but he could exercise his discretion to allow female members into the Men's Grille. Walsh testified to the numerous events that are held in the Men's Grille, when that space is made available by the management as a mixed-gender facility. The general manager makes the decision when to use the Men's Grille as a mixed-gender facility on an "as needed" basis. Walsh admitted that as manager he could have chosen not to enforce the men-only rule at all. He stated there was no reason for the policy regarding men only in the Men's Grille other than the enjoyment of the men. Although Southern Trace conducts an annual survey of its membership, at no time during Walsh's tenure as general manager of Southern Trace did he conduct a vote of the total membership to determine if it supported the men-only policy for the Men's Grille.
On April 11, 2000, five adult female residents of the Parish of Caddo filed suit against Southern Trace and Club Corp; they are Merrilee G. Albright, Julie M. Lafargue, Dolores George Lavigne, Ann Mathison McLaurin, and Jody L. Roberts. Their petition alleges that on Sunday, March 26, 2000, Lafargue along with her non-member female guest, Albright, and another female guest attempted to get food service at Southern Trace. The dining facility and bar known as the Men's Grille was the only restaurant facility open on Sundays. Shortly after the women entered the Men's Grille, they were approached by male employees of Southern Trace who informed them they were not allowed in the Men's Grille because they were women; they were told they would not be served and were asked to leave. As the women were leaving the Men's Grille, a male member of Southern Trace yelled out to them, "Don't let the door hit you on the ass on your way out."
In addition to Lafargue, plaintiffs Lavigne, McLaurin, and Roberts are all members of Southern Trace. Their petition alleges all of them have been denied entrance into the Men's Grille and have been denied access to restaurant services at Southern Trace. On the occasions when the Men's Grille is used for events attended by men and women, a portable partition is put in place to shield the entrance to the men's locker room from the view of persons entering the Men's Grille. The plaintiffs do not seek entry into the men's locker room, but seek only that the partition be used and the Men's Grille be open to all adult members and their guests, regardless of gender.
The petition further alleges the women sought to have the discriminatory policy eliminated prior to filing suit. They allege they were told by a former member of the Board of Directors, that the Men's Grille atmosphere would offend "ladies" because "all those men do in there is spit, scratch, and cuss."

DISCUSSION
Emanating from the people of Louisiana, the Constitution is our most fundamental law. See, Preamble of the Constitution of the State of Louisiana, 1974, which states, in pertinent part: "We, the people of Louisiana ... do ordain and establish this constitution." Indeed, as stated at the very outset of the Louisiana Constitution: "All government, of right, originates with the people." La. Const. art. I, § 1. The words of John Marshall, although referring to the United States Constitution, are apropos: "The people made the Constitution.... It is the creature of their will."[11]
*127 The constitutional provision at the core of this litigation is La. Const. art. I, § 12, entitled "Freedom from Discrimination," which provides:
In access to public areas, accommodations, and facilities, every person shall be free from discrimination based on race, religion, or national ancestry and from arbitrary, capricious, or unreasonable discrimination based on age, sex, or physical condition.
A similar provision guaranteeing persons freedom from discrimination by governmental entities is found in La. Const. art. I, § 3, which is entitled "Right to Individual Dignity" and which provides in pertinent part:
No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations.
We must distinguish Article I, § 3 from Article I, § 12. Section 3 is directed toward laws which discriminate. Section 12 is directed toward those who would discriminate. Article I, § 12 simultaneously recites a principled belief which inspires justice, fairness, and impartiality while commanding that behavior with the force of law. This constitutional provision expresses an aspirational goal of the people of this state that arbitrary, capricious, or unreasonable forms of gender discrimination should be eradicated.
Article I of the Louisiana Constitution of 1974 is entitled "Declaration of Rights." Section 1 of Article I states that "[t]he rights enumerated in this Article are inalienable by the state and shall be preserved inviolate by the state." The Committee on Bill of Rights and Elections, in its initial presentation of Article I to the Constitutional Convention, professed that a bill of rights could only proscribe governmental, as opposed to non-governmental, action. When proposals going beyond the state action concept and prohibiting discrimination by private individuals, as well as by government were made, a "most hectic debate" ensued.[12] No precise definition was given for "public areas, accommodations, or facilities," although at least one Constitutional Convention delegate acknowledged a broad construction was intended and indicated the provision was to encompass "restaurants, taverns, barber shops, nursing homes, clinics, [and] hospitals."[13] It was anticipated that the public-accommodation language and the provisos in Section 3 and Section 12 that persons are protected from gender-based discrimination only if that discrimination is arbitrary, capricious, or unreasonable would be defined in the course of case-by-case adjudication.[14]
The original committee proposal included a final sentence, "Nothing herein shall be construed to impair freedom of association," which was deleted from a compromise amendment. The Constitutional Convention twice defeated efforts to restore the language, fearful of its potential to destroy the rights that were being provided in the amendment.[15]
The provisos in Section 3 and Section 12 that persons are protected from gender-based discrimination only if that discrimination *128 is arbitrary, capricious, or unreasonable reflect a realization by the Constitutional Convention that certain forms of discrimination are not only rational but are necessary. Reasonable forms of discrimination include, for example, establishment of separate restroom facilities for men and women.[16]

District Court Decision:
Although there is a lack of a precise definition for "public" areas in Section 12 and it remains ultimately this court's obligation and responsibility to decide what the constitution means, in 1983 the legislature enacted LSA-R.S. 49:146 which reiterates the provisions of La. Const. art. I, § 12 and provides an appropriate guide and analytical tool for the courts' use in delineating between a public facility and a private club. The district court appropriately recognized that the threshold issue in this case was whether Southern Trace should be classified as "public" or "private." Addressing that issue, the court stated:
The threshold question is whether Southern Trace Country Club is a `public facility,' in which case, [La. Const. art. I, § 12] applies; or rather a `private club,' in which case it does not. The Court is guided by Revised Statutes 49:146[(3)] which provides ... criteria to determine if an organization is a private club; to wit:
(a) Selectiveness of the group in addition of members;
(b) Existence of formal membership procedures;
(c) Degree of membership control over internal governance, particularly with regard to new members;
(d) History of organization;
(e) Use of club facilities by nonmembers;
(f) Substantiality of dues;
(g) Whether the organization advertises; and
(h) Predominance of a profit motive.
The evidence clearly shows that Southern Trace Country Club, when evaluated by statutory requirements, is a public facility. There is no real selectiveness in the addition of new members. Bulk mailings soliciting membership and addressed to `resident,' are sent by zip code. There was no evidence of membership requirements other than the ability to pay dues and initiation fees; which Southern Trace Country Club is willing to finance at 10% [APR].
The club is completely run by Southern Trace Country Club of Shreveport, Inc. The members have no voice in the running of the club or the selection of the Board of Directors. The history of the organization is simply an effort to provide a desired product and/or service for a fee to make a profit. Club facilities are routinely used by non-members, the owner corporation budgets for considerable annual advertisement, and the profit motive predominates.[[17]]
*129 Albright v. Southern Trace Country Club of Shreveport, Inc., 37,725, pp. 2-3 (La.App. 2 Cir. 10/17/03), 859 So.2d 238, 240-241, quoting the district court's reasons for judgment. The district court's rejection of Southern Trace's defense that it was a private club and the court's conclusion that Southern Trace was subject to the provisions of La. Const. art. I, § 12 were not challenged on appeal. Thus, the private-or-public-facility issue is not before this court.[18]
Having determined that Southern Trace is a public facility, the district court then considered whether the men-only policy for general use of the Men's Grille resulted in "arbitrary, capricious, or unreasonable discrimination based on ... sex." The court noted the Southern Trace regulation governing the use of this area of the clubhouse:
D. Men's Grille
* Unless otherwise authorized by the Board of Directors this room is restricted to the use of men and their adult male guests.
* Children Sixteen (16) and under are not allowed to use this room at any time.
The court further noted Ramsey's "credible" testimony that in order to be competitive, Southern Trace was designed and built with food and beverage service areas in the vicinity of locker rooms, specifically the Men's Grille and the Ladies' Card Room, providing patrons with the convenience of accessing these areas in states of undress. Finding this "amenity" was "continually utilized," the court concluded the separate areas were dictated by economic and competitive market factors rather than discrimination.
The district court did not refer to any particular testimony or documentation but found that "upon advance scheduling, and the concomitant opportunity to erect a modesty shield [in front of the entrance to the men's locker room], the Men's Grille is regularly available as a `co-ed' facility for the use of both members and non-members, and has been thus utilized on numerous occasions."[19] The court did not comment *130 on the facial anomaly that Southern Trace's written regulation restricts use of the Men's Grille to adult males "[u]nless otherwise authorized by the Board of Directors[,]" but the two general managers had unfettered discretion to allow that dining facility to be used in a manner that is non-gender-discriminatory if and when the managers perceived a need for such use.
Without citing any authority, the district court stated the "heightened standard of review which has been applied to sex based classification does not make gender a proscribed classification but it does mean that gender classification may not be used to create or perpetuate the legal, social, or economic inferiority of women."[20] The court stressed that the plaintiffs who became members of Southern Trace agreed to abide by member requirements and concluded the same-sex eating facilities "adjunct to the locker rooms" did not constitute arbitrary, capricious, or unreasonable discrimination.

Court of Appeal Opinion:
After noting that the status of Southern Trace as a public facility, not a private country club, had not been appealed, the court of appeal rejected the defendants' contention that the remaining issues were questions of fact subject to the manifest error standard of review. The court stated that "the trial court was called [upon] to interpret an article of the Constitution, which is clearly a question of law." Albright, 37,725 at 3, 859 So.2d at 241. Citing Cleco Evangeline, LLC v. Louisiana Tax Commission, 01-2162 (La.04/03/02), 813 So.2d 351, 353, the court of appeal concluded de novo review was appropriate.
In light of the scant jurisprudence interpreting La. Const. art. I, § 12,[21] the court of appeal analogized the instant case to equal protection challenges under La. Const. art. I, § 3, which are analyzed based on the discriminatory classifications enumerated therein. Citing Manuel v. State, 95-2189 (La.03/08/96), 692 So.2d 320, *131 the court stated an intermediate level of scrutiny is reserved for laws that classify persons according to the enumerated bases, including sex; the burden is on the proponent of the classification to prove that the classification is not arbitrary, capricious, or unreasonable, and the standard of judicial review of that proof is heightened. Thus, the court of appeal examined Southern Trace's policy under "an intermediate scrutiny to determine whether Southern Trace established that the classification (i.e., the exclusion of female members) was not arbitrary, capricious, or unreasonable because it substantially furthers an appropriate objective." Albright, 37,725 at 4-5, 859 So.2d at 241-242.
The court of appeal noted three objectives for the discrimination were articulated or inferred: economic/market factors, privacy, and male preference. After review of the record and consideration of cases from various jurisdictions that addressed similar issues and/or defenses, the court concluded:
Economic/market factors are not an appropriate objective where Southern Trace hoped to profit from the fact that it discriminated against women in the Men's Grille. Although privacy concerns could be a legitimate objective, Southern Trace was unable to carry its burden that the Men's Grille was an area that should be private. Finally, male preference in a public club can never be an appropriate objective by which to justify discrimination. Thus, we conclude, as a matter of law, that the holding of the trial court was in error.
Albright, 37,725 at 11, 859 So.2d at 245.

Defendants' Arguments:
Subsequent to our grant of a writ in this matter, defendants argued in their brief and oral argument that the court of appeal's opinion should be reversed because the court of appeal erroneously 1) applied a de novo standard of review, 2) imposed the burden of proof on Southern Trace, and 3) reversed the trial court's decision absent manifest error. We hold there is no merit to these arguments for the following reasons.

Standard for Appellate Review:
We stated at the beginning of this opinion that at the time we granted defendants' writ application we intended to consider the proper standard of review. However, having reviewed the testimony and documentary evidence in the record before us, we now decline to articulate a bright line rule for the proper standard of appellate review in cases involving assertion of rights protected by La. Const. art. I, § 12. We dispose of the issue in this fashion because in this particular case either de novo review or review pursuant to the manifest error standard reveals the trial court's ultimate conclusion is flawed and requires reversal.
We postpone discussion of the "objectives" articulated for the discriminatory policyeconomic/market factors, privacy, and male preferenceidentified by the court of appeal in its de novo review until our discussion of the evidence from a standpoint of determining whether the trial court committed manifest error. At this point, we merely state that we agree with defendants that the trial court was not called upon to "interpret" Section 12, which is clearly and unambiguously worded in terms common to constitutional and statutory provisions. Thus, the appellate court's reliance on Cleco, 01-2163, 813 So.2d 351, to perform a de novo review is questionable.

Burden of Proof:
Next, we consider defendants' argument to this court that the court of appeal erroneously shifted the burden of proof to *132 them. This untenable argument is based on faulty premises.
First, defendants insist throughout their brief that there was no discrimination by Southern Trace and that the plaintiffs were not the victims of discrimination (i.e., "Southern Trace does not discriminate against anyone on any basis."). In order to agree with defendants on this point, we would have to depart from and ignore a statutory definition of discrimination that is directly on point, LSA-R.S. 51:2232(3), which provides:
"Discriminatory practice in connection with public accommodations" means any direct or indirect act or practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person or persons because of race, creed, color, religion, sex, age, disability, or national origin.
Thus, the "exclusion" of females from the Men's Grille and the "restriction" of that area to use by adult males, which the defendants have judicially admitted,[22] resulted in "segregation ... because of ... sex" of that "public accommodation" which was a "discriminatory practice in connection with public accommodations."
Defendants' second faulty premise is that the trial court correctly placed the burden of proving "arbitrary, capricious, or unreasonable" on the plaintiffs, but the court of appeal erroneously shifted that burden to defendants pursuant to an analogy of Section 12 to Section 3 of Article I of the Louisiana Constitution of 1974. Defendants urge that because Section 12 measures conduct between private, non-public actors and Section 3 proscribes action by governmental actors, the court of appeal should have analogized the instant case with litigation pursuant to the public accommodation provisions of the Civil Rights Act of 1964, 42 U.S.C.2000a, instead of the Equal Protection provisions of the Louisiana Constitution.
We have considered the authorities defendants rely on and find these authorities would not require a result that differs from the result reached by the court of appeal. Defendants rely on the federal court of appeal opinion in Hornick v. Noyes,[23] which was a resident's discrimination suit under the public accommodations provisions, Title II, of the Civil Rights Act of 1964 against the Young Women's Christian Association of Madison, Wisconsin *133 (YWCA). The elderly resident, who was of Jewish decent, asserted the YWCA's action in evicting her from the premises on the basis of complaints by fellow residents violated her civil rights because their complaints were motivated by antisemitism. Because of the peculiar facts of Hornick and the lack of recent Title II precedent, that case was tried in accordance with the allocation of burdens and order of proof used in Title VII, equal employment cases. Under that standard, the plaintiff has the burden of establishing by a preponderance of the evidence a case of discrimination. The burden of production then shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions. The burden shifts back to the plaintiff to prove that defendant's proffered reasons were pretextual.[24]
The Hornick court specified plaintiff's burden of establishing by a preponderance of the evidence a case of discrimination consisted of proof by Mrs. Hornick that she "was a member of a protected class, that she was evicted, and that her room remained available for occupancy by others."[25] In the instant case, plaintiffs proved three things: 1) Southern Trace is a public accommodation, not a private country club; 2) Southern Trace has a discriminatory practice of excluding females from a portion of its public accommodation which is a dining facility known as the Men's Grille; and 3) plaintiffs, who are members of Southern Trace, were excluded from the Men's Grille specifically on the basis of their gender.
We find that the above constitutes proof of a prima facie case and under any standard would shift the burden of proof to the defendants to prove that Southern Trace's discriminatory practice was not "arbitrary, capricious, or unreasonable." Thus, the court of appeal correctly examined Southern Trace's policy under "intermediate scrutiny" and determined whether Southern Trace established that its policy of exclusion of female members was not arbitrary, capricious, or unreasonable because it substantially furthers an appropriate objective.
More importantly, we find the analogy utilized by the court of appeal is more cogently appropriate than the analogy suggested by the defendants. Section 3 is the equal protection provision of the Louisiana Bill of Rights, while Section 12 is the public accommodations provision.[26] The language of Section 12"every person shall be free ... from arbitrary, capricious, or unreasonable discrimination based on ... sex"is obviously patterned after the language"No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of ... sex"contained in the third sentence of Section 3.
Almost 20 years ago, in Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094, 1107-1108 (La. 1985), this court recognized that La. Const. art. I, § 3 sets up a three-tiered spectrum for analyzing equal protection challenges based on legislative classifications. At one extreme are laws that are repudiated completely because they classify individuals based on race or religious beliefs. At the other end of the spectrum are laws that do not classify individuals on any of the bases enumerated in Section 3; those classifications are subject to the minimal standard of scrutiny and will be upheld if they relate to a legitimate governmental purpose.
*134 Approximately 10 years post-Sibley, this court adhered to the three levels of scrutiny and the resultant shifting of the burden of proof. In Moore v. RLCC Technologies, Inc., 95-2621, pp. 9-10 (La.2/28/96), 668 So.2d 1135, 1140-1141, this court stated:
In the middle of the spectrum are laws that fall within the express prohibition set forth in the third sentence of La. Const. art. I, § 3, which limits the Legislature's power to classify individuals based on the six enumerated grounds. When a statutory classification is based on any of these enumerated grounds, the classification is a prima facie denial of equal protection. Because the ordinary presumption that statutes are constitutional no longer applies, there is a reversal of the ordinary placement of the burden of proof on the party asserting unconstitutionality. The burden is shifted to the proponent of the classification and the standard of review is heightened, requiring the proponent to establish that the classification substantially furthers an important governmental objective.
We hold that the shifting of the burden of proof to the defendants following the prima facie case of gender-based discrimination directed at the plaintiffs in a place of public accommodation established by the plaintiffs provides this court with no reason to disturb the decision of the court of appeal.

Manifest Error:
A significant factor in the instant case is that plaintiffs have not been denied membership in Southern Trace on the basis of gender but, despite their status as holders of full golf-memberships,[27] were denied, on the basis of gender, access to the public accommodation known as the Men's Grille.[28]
Neither the individual members of Southern Trace nor the members of the Board of Governors are parties; the only defendants are Southern Trace and Club Corp. The vertical interaction between the general manager of Southern Trace, who was the agent of the two corporations, and the female members who brought suit was the sole locus of the discrimination that denied these women access to the public accommodation on the basis of gender. Even though the general manager made the decision to enforce the men-only policy for sound business reasons, including the appeasement of the preferences of the male members who made up 85 percent of the golfers, it was the general manager, on behalf of the defendants, who made the discriminatory decision on the basis of gender.[29]
*135 The district court apparently concluded that because the men-only policy was dictated by economic reasons, and not an intent to discriminate, the discrimination in fact was reasonable. However, lack of "malevolent intent" does not prevent a policy from being discriminatory when it results in treatment of a person in a manner which, but for that person's sex, would be different.[30] Thus, economic/market factors, although relevant, should receive a heightened standard of review when offered as a reason for gender discrimination. Moore, 95-2621 at 9-10, 668 So.2d at 1140-1141. As the court of appeal noted, the country club's desire in this case to make more money is not a valid reason to discriminate when its increased revenue is derived from discrimination.[31] The district court's finding to the contrary was manifestly erroneous.
The stated objective of one gender's preference, although relevant, must pass muster under a heightened standard of review. Southern Trace's assertion of male preference as an appropriate objective for gender discrimination is akin to an airline's exclusion of males from its flight attendant workforce on the basis of satisfying patrons' presumed penchant for physically attractive, female flight attendants.[32] Further, the general managers' admissions that the only reason for the men-only policy was to satisfy the whims of some of the male members of the club evidenced managerial actions that were completely arbitrary.
The court of appeal was entirely correct in deciding Southern Trace failed to carry its burden of proof that either economic/market factors or male preference was an appropriate objective furthered by its gender-based discriminatory practice in this case. The district court's findings to the contrary are either clearly wrong or immaterial to the resolution of the ultimate issue in this case. The conclusion that defendants failed to satisfy their burden of proving its men-only policy was not arbitrary, capricious or unreasonable is just as compelling under the manifest error standard of review as it is under de novo review.
The district court reached the decision that there was no arbitrary, capricious, or unreasonable discrimination by Southern Trace based on credibility determinations of the testimony of the witnesses, review of the exhibits, and a personal tour of the facility in question.[33] We agree with the court of appeal that the underlying theme of the trial judge's decision was that the discrimination was reasonable because of *136 privacy concerns.[34] In a gender-based discrimination case a right to privacy is certainly a more compelling objective than either economic/market factors or male preference. However, it was the defendants' burden to prove that failure to enforce the men-only policy would pose a threat to the privacy either gender is entitled to expect in a locker room area. The testimony in the record regarding the layout of the Men's Grille belies any threat to the men's privacy in the locker room itself. Indeed, when the Men's Grille is used for events attended by males and females, a screen is simply placed in the hallway that connects the Men's Grille to the entrance of the men's locker room. The men's only loss of privacy from elimination of Southern Trace's men-only discriminatory policy will be the inability to enter the Men's Grille attired only in a towel or even naked, as some persons have indicated they do. This state of dress or undress was patently contrary to the clubhouse rule that existed in 2002 and required "casual but appropriate attire" in the dining areas. Although being attired in a towel only, or lack thereof according to the testimony, may be casual, it can hardly be described as "appropriate" for a dining area. Nevertheless, we reiterate the men's locker room itself has tables which can facilitate the serving and consuming of food. The plaintiffs have no interest in entering the men's locker room.
We find that the reversal of the district court judgment by the court of appeal poses no threat to the privacy of the male members of Southern Trace. On the numerous occasions in the past when the Men's Grille has been designated by the general managers for simultaneous use by males and females, the relatively simple device of placing a screen to block the view through the hallway from the Men's Grille to the men's locker room entrance has sufficed. When the men-only discriminatory policy is eliminated, use of the privacy screen and enforcement of the dress code which required "appropriate attire" for the Men's Grille will maintain the men's locker room environment inviolate and at the same time accommodate those members and guests of both genders who have no penchant for dining in an area occupied by men in various stages of undress.
Our final consideration of manifest error focuses on the constitutional provision that persons shall be free from "arbitrary, capricious, or unreasonable" gender-based discrimination.[35] Although the district court mentioned all three terms, the court did not articulate how the facts demonstrate the men-only discriminatory policy was not arbitrary or capricious. The district court did not mention the general managers' admissions that male preference was their sole reason for enforcing the exclusionary policy. The court of appeal's analysis, although ostensibly made pursuant to de novo review, points out the manifest error of the district court, as follows:
Regarding the reasoning that some of the men simply prefer the male exclusivity of the Men's Grille, we ... look to the clear and unambiguous wording of Section 12 that "every person shall be free from ... arbitrary, capricious, or unreasonable discrimination based on... sex...." (Emphasis added). Capricious is defined as "governed by or showing caprice; unsteady; changeable; fickle; fanciful;...." Webster's New *137 Universal Unabridged Dictionary, Second Edition, 1972. Further, caprice is defined as "whim, arbitrary, seemingly unfounded motivation. Disposition to change one's mind impulsively." Black's Law Dictionary, Fifth Edition, 1979. Further, in Jemison v. City of Kenner, 277 So.2d 728, 729 (La.App. 4th Cir. 1973), writ denied, 281 So.2d 753 (La. 1973), the court noted that ". . . The words arbitrary and capricious are practically synonymous and mean without reasonable cause and do not necessarily imply an opprobrious connotation. Arbitrary action is based upon one's will and usually implies an abuse of one's authority or power...." (Citation omitted.) (Emphasis added.) A reasoning that those making the sex-based exclusion simply prefer the policy is by definition arbitrary and capricious, thus making the policy clearly the illegal discrimination [against] women under Section 12. The objective or justification of some men's preference, on its face arbitrary and capricious, is woefully insufficient to support the appellees' policy.

Albright, 37,725 at 8-9, 859 So.2d at 243.
Thus, we find no merit in defendants' argument that the court of appeal erred in reversing the district court's decision absent manifest error.

Freedom from Discrimination:
By limiting gender discrimination in places of public accommodation, our constitution and consistent statutory provisions protect our citizenry from "archaic and overbroad assumptions about the relative needs and capacities of the sexes [that] force[ ] individuals to labor under stereotypical notions that often bear no relationship to their actual abilities."[36] Even statutes designed to compensate for and ameliorate the effects of past discrimination must be carefully tailored to avoid the inherent risk of reinforcing the stereotypes about the "proper place" of women and their need for special protection.[37]
Southern Trace's exclusionary policy is based on an inaccurate, stereotypical depiction of male behavior. The policy implies protectionism of females and a veiled attempt to justify discrimination which cannot be justified based on the facts of this case. While not attributed to any employee of the defendants, the discriminatory policy enforced by the management prompts such comments as "[d]on't let the door hit you on the ass on your way out[ ]" when the women were summarily evicted from the dining area.
In the late 1800s when the Washington Monument was completed, according to one narrative of the history of that Washington, D.C. landmark, men only could ride to the top in a steam-driven elevator. It was perceived that the ride was too dangerous for the female gender. Women, however, were permitted to climb the 800 steps to the top. We know of no record kept of the number of women who exercised their right to climb the stairs while their male "protectors" were at the top awaiting them. By breaking through the proverbial "glass ceiling," women in the year 2004 have been able to ascend to the top of virtually every profession. As the court of appeal noted in the instant case,
Louisiana women work side by side with men in the courtrooms, operating rooms, and boardrooms. There is no reason... they should still be excluded from country club dining rooms which are deemed to be public accommodations.
Albright, 37,725 at 10-11, 859 So.2d at 244-245.
*138 One can only wonder if defendants would have refused access to the Men's Grille had a female resident of a governor's mansion or a female justice of the highest court in the nation or the state presented herself as a guest of a Southern Trace member. Regardless of their political, social, or individual achievements, females deserve no less than the treatment that other members and their guests receive based on the facts of this case.
In the twenty-first century, it is simply archaic to cite protection of women from the sights and sounds of a locker room environment as an excuse for excluding them from the public dining area as it exists in this country club. Ultimately, the policy of the defendants prohibited women from dining with men in a particular room despite the fact that issues of privacy can be easily, readily, and simply addressed with a partition that is frequently used.
These plaintiffs both alleged and testified that they were not seeking admittance to the men's locker room where privacy concerns would predominate. Some forms of gender-based discrimination are rational and do not offend the constitution. Gender discrimination is reasonable and not arbitrary or capricious when based on legitimate privacy concerns or based on the obvious differences that nature has bestowed on the two genders.
In addition to establishing the framework of government and establishing individual rights of citizens, our constitution also espouses certain aspirational goals which limit gender discrimination. These goals, embodied in our constitution, the fundamental law which emanates from the people, impose an obligation to avoid arbitrary, capricious, or unreasonable discrimination based on gender.

CONCLUSION
We hold today that based on the facts of this case defendants have violated plaintiffs' constitutional right to be free from arbitrary, capricious, or unreasonable discrimination based on gender by enacting and enforcing a men-only policy in a public dining facility. The court of appeal was correct in reversing the district court's ruling that "excused" the discrimination on the basis of reasonableness.
AFFIRMED.
LOBRANO, J., ad hoc, concurs in the result.
KNOLL, J., concurs in the result only and assigns reasons.
CIACCIO, J., ad hoc, concurs in the result for the reasons assigned by KNOLL, J.
KNOLL, Justice, concurring.
We granted this writ primarily to determine the appropriate standard of review in determinating the constitutionality of a discriminatory policy under La. Const. art. I, § 12. In my view, the majority opinion fails to set forth the correct level of scrutiny in determining whether a policy is illegally discriminatory under La. Const. art. I, § 12 and inappropriately fails to determine the standard of review of the district court's determination of constitutionality, the reason for which we granted this writ. For these reasons, I respectfully concur in the result.
The majority opinion, as well as the court of appeal, erroneously equates the policy of a private entity to state action by imposing the heightened intermediate scrutiny utilized in both state and federal equal protection analysis, i.e. whether the discriminatory action substantially furthers an appropriate governmental objective. Under La. Const. art. I, § 12, discrimination *139 based on gender is legal and constitutional if it is not arbitrary, capricious, or unreasonable. The level of scrutiny a court must employ when examining a gender discriminatory policy is not whether the policy substantially furthers an appropriate governmental objective, but whether the policy is arbitrary, capricious or unreasonable. In my view, because the determination of whether a discriminatory gender policy is arbitrary, capricious, or unreasonable is a factual determination, an appellate court should review the district court's determination of constitutionality under the manifest error or clearly wrong standard of review.

La. Const. Art. I, § 12
The interpretation of a constitutional provision must begin with the language of the constitution itself. East Baton Rouge Sch. Bd. v. Foster, 02-2799, p. 15 (La.6/6/03), 851 So.2d 985, 996. When a constitutional provision is plain and unambiguous, and its application does not lead to absurd consequences, its language must be given effect. Unequivocal constitutional provisions are not subject to judicial construction and should be applied by giving words their generally understood meaning. Cajun Elec. Power Co-op. v. Louisiana Pub. Serv. Com'n, 544 So.2d 362, 363 (La.1989) (on rehearing).

La. Const. art. I, § 12 provides:
In access to public areas, accommodations, and facilities, every person shall be free from discrimination based on race, religion, or national ancestry and from arbitrary, capricious, or unreasonable discrimination based on age, sex, or physical condition.
Accordingly, under La. Const. art. I, § 12, a person shall be free from arbitrary, capricious, or unreasonable discrimination on the basis of sex in access to public areas, accommodations, and facilities. Based upon the plain meaning of this provision, only that discrimination which is arbitrary, capricious, or unreasonable is considered unconstitutional.
In determining whether a policy of access to a public accommodation is unconstitutional under La. Const. art. I, § 12, a court must determine whether (1) a public area, accommodation, or facility (2) has a policy of discrimination (3) that is arbitrary, capricious, or unreasonable. The party asserting the unconstitutionality of the policies or practices of a public accommodation has the burden of establishing by a preponderance of the evidence a prima facie case of arbitrary, capricious, or unreasonable discrimination. See Hornick v. Noyes, 708 F.2d 321, 325, n. 8 (7th Cir.1983), cert. denied, 465 U.S. 1031, 104 S.Ct. 1295, 79 L.Ed.2d 696 (1984); see also, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
In this case, the plaintiff must establish (1) that the facility is a public accommodation, (2) that the plaintiff is a member of a protected class, (3) that the plaintiff suffered disparate treatment on the basis of gender, and (4) that such disparate treatment was arbitrary, capricious, or unreasonable. Once the plaintiff has presented such evidence of a prima facie case, the burden of proof shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions. See Hornick, 708 F.2d at 325, n. 8. The burden then shifts back to the plaintiff to prove that defendant's proffered reasons were pretextual. Id. Most importantly, the ultimate burden of proving discrimination always rests on the plaintiff.

Arbitrary, Capricious, or Unreasonable Discrimination
As all other elements have been satisfied, i.e., the club is a public accommodation, *140 the plaintiffs are members of a protected class under La. Const. art. I, § 12, and the plaintiffs have suffered disparate treatment on the basis of their gender, the plaintiffs must demonstrate and the court must determine whether the discrimination is arbitrary, capricious, or unreasonable.
La. Const. art. I, § 12 sets forth the standard of review the court must employ when determining whether discrimination based on gender is unconstitutional, i.e. whether the discrimination or disparate treatment is arbitrary, capricious, or unreasonable. Thus, the standard to review the actions of the club to determine a violation of La. Const. art. I, § 12 is not the heightened scrutiny to which the district court and appellate court refer, but rather requires the court to make a factual determination of whether the policy or practice of discrimination is arbitrary, capricious, or unreasonable.
Additionally, the majority's, as well as the court of appeal's,[1] reliance upon La. Const. art. I, § 3 is misplaced. The majority opinion correctly distinguishes La. Const. art. I, § 12 from La. Const. art. I, § 3 by stating: "Section 3 is directed toward laws which discriminate. Section 12 is directed toward those who would discriminate." Albright v. Southern Trace Country Club of Shreveport, No. 03-3413, op. at 127. La. Const. art. I, § 3 was inspired by federal constitutional equal protection law to prohibit state action from discriminating on the basis of gender, whereas La. Const. art. I, § 12 was inspired by the federal Civil Rights Act to prohibit private entities from employing arbitrary, capricious, or unreasonable discrimination based on gender in their policies and practices of access to public accommodations.
Moreover, while La. Const. art. I, § 3 prohibits discrimination in state action and requires the State or proponent of the discriminatory classification to establish that the classification is not discriminatory because it substantially furthers an appropriate governmental objective, La. Const. I, § 12 requires the proponent of a gender-based discriminatory policy of access to a public accommodation to establish the policy is not arbitrary, capricious, or unreasonable.
Although the level of scrutiny employed in assessing claims of gender discrimination in equal protection and public accommodation cases are as distinct as the equal protection and public accommodation provisions themselves, the majority erroneously affirms the court of appeal's use of the heightened level of scrutiny employed to assess claims of gender discrimination under Section 3 to the Section 12 claim at issue in this case, finding: "[T]he analogy utilized by the court of appeal is more cogently appropriate than the analogy suggested by the defendants. Section 3 is the equal protection provision of the Louisiana Bill of Rights, while Section 12 is the public accommodations provision. The language of Section 12`every person shall be free ... from arbitrary, capricious, or unreasonable discrimination based ... sex'-is obviously patterned after the language`No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of ... sex' contained in the third sentence of section 3." Albright, op. at 133 (footnote omitted). The majority, relying on this analogy to the state action equal protection analysis, further erred by finding "[t]he stated objective *141 of one's gender preference, although relevant, must pass muster under heightened standard of review." Albright, op. at 135.
In effect, the majority erroneously compares the discriminatory policy or practice of a private entity in this case to state action and requires the private entity seeking to withstand the constitutional challenge to establish the policy "substantially furthers an appropriate objective." Albright, 37,725 at p. 5, 859 So.2d at 241-42. The court of appeal adopted this language from Manuel v. State, 95-2189 (La.03/08/96), 692 So.2d 320, which set forth the standard of review for discriminatory laws under La. Const. art. I, § 3 as whether "such a classification substantially furthers an appropriate governmental purpose." Manuel v. State, 95-2189, p. 5 (La.03/08/96), 692 So.2d 320, 340 (on rehearing). Even though the court of appeal left out the word "governmental," the burden of proof still remains the same, i.e., to survive a constitutional attack, the proponent must establish the discriminatory policy substantially furthers an appropriate governmental objective or purpose. Through its affirmation of the court of appeal's rationale, the majority is effectively blessing this erroneous interpretation of the constitution. In my view, the majority erred as a matter of law. This intermediate level of scrutiny should only be applicable in cases involving state action and should not apply to private entities who do not possess the police power necessary to further an appropriate governmental objective or to satisfy such a heightened level of scrutiny.
A private entity cannot carry such a burden and most importantly, a private entity is not required to carry such a burden, because discrimination based on gender is allowed as long as it is reasonable. Therefore, to withstand a constitutional challenge under La. Const. art. I, § 12, a proponent of the gender-based discriminatory policy needs only to establish that the policy is not arbitrary, capricious, or unreasonable.
The constitutional provision setting forth the appropriate arbitrary, capricious, or unreasonable standard of review is unequivocal and, therefore, should be applied by giving its words their generally understood meaning. Cajun Elec. Power Co-op., 544 So.2d at 363. Arbitrary means "determined by will or caprice; selected at random." Merriam-Webster's Desk Dictionary 27 (1995). Caprice is defined as "a sudden whim or fancy; an inclination to do things impulsively." Id. at 80. Further, "arbitrary and capricious" means "characterization of a decision or action taken by an administrative agency or inferior court meaning willful and unreasonable action without consideration or in disregard of facts or law or without determining principle." Black's Law Dictionary 105 (6th ed.1990).
In determining whether an action is arbitrary or capricious, the court must determine whether the action has a reasonable relation to a legitimate end. See Treigle v. Acme Homestead Ass'n, 181 La. 941, 160 So. 637, 643 (1935) (determining the constitutionality of several acts governing the withdrawal of shareholders in the Acme Homestead Association). Moreover, the determination of whether an action is arbitrary, capricious, or unreasonable is a factual determination subject to a manifest error standard of review. See Calogero v. Safeway Ins. Co. of Louisiana, 99-1625, p. 5 (La.1/19/00), 753 So.2d 170, 173 (determining whether a an insurer's handling of a claim is arbitrary and capricious); Reed v. State Farm Mut. Auto. Ins. Co., 03-0107, p. 12 (La.10/21/03), 857 So.2d 1012, 1020 (interpreting La. R.S. 22:658 and 22:1220). Further, "the constitution gives *142 the courts freedom to determine reasonableness in these circumstances." See Lee Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La. L.Rev. 1, 40 (1974-1975). Simply stated, although we are called upon to determine a constitutional issue, this determination is dispositive on pure factual grounds, and because of the discretion of the district court over these factual issues, I find the manifest error-clearly wrong standard is the appropriate standard of review.
The district court found the exclusionary policy at issue in this case was not arbitrary, capricious, or unreasonable, but rather was reasonable in light of economic/market considerations and privacy concerns. The court of appeal reviewed the district court's factual determination under a de novo standard, and although the court employed the wrong standard of review, the court of appeal did reach the correct result, finding the policy unconstitutional. This same conclusion may be reached through a manifest error-clearly wrong standard of review.

Manifest Error Standard of Review
An appellate court may not set aside a district court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Parish Nat. Bank v. Ott, 02-1562 (La.2/25/03), 841 So.2d 749, 753. This court has announced a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the district court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Id. Thus, the issue to be resolved by the court is not whether the trier of fact was right, but whether the factfinder's conclusion was a reasonable one.
The record reveals the district court's conclusion that the exclusionary policy is not arbitrary, capricious, or unreasonable is unreasonable. Moreover, it is evident from the record that the economic/market factor and the privacy concerns are mere screens for the underlying motive for this exclusionary policymale preference.
Customer preference cannot justify sex discrimination. See Diaz v. Pan American World Airways, Inc., 442 F.2d 385 (5th Cir.1971) (finding airline could not refuse to hire male flight attendants simply because male customers preferred the employment of female flight attendants). Moreover, "rational self-interest" and "economic motive" cannot be used to validate a practice otherwise barred by the public accommodations law. See Koire v. Metro Car Wash, 40 Cal.3d 24, 219 Cal.Rptr. 133, 707 P.2d 195, 199 (1985); Marina Point, Ltd. v. Wolfson, 30 Cal.3d 721, 180 Cal. Rptr. 496, 640 P.2d 115 (1982). As noted by the court of appeal, economic and market "factors are not an [sic] appropriate objective [sic] when the discrimination is the reason for economic success, or said another way, when the club strives to make more money because it discriminates." Albright, 37,725 at p. 6, 859 So.2d at 242.
The locker areas, which include the Men's Grille and the Ladies' Card Room, are primarily utilized in conjunction with golf. While males comprise at least eighty-five percent of the club's golf activities, females comprise fifteen percent of the club's golf activities. Consequently, this results in disparate staffing of the eating areas. The Men's Grille is staffed from 11:00 a.m. until sundown or the conclusion of the golf activities, whichever occurs first, while the Ladies' Card Room is not continually staffed; rather, an attendant is present part-time without call and is available upon call of a patron. Additionally, *143 the Men's Grille grosses at least $800 per day in revenue, while the Ladies' Card Room grosses less than twenty-five percent of the Men's Grille gross, i.e, less than $200 per day. Neither the Men's Grille nor the Ladies' Card Room prepare food. All food is prepared in the kitchen and transported to the area requested. Thus, there is no disparity of menu or quality of food.
The club also provides a mixed-gender eating facility referred to as the Azalea Grille. On March 26, 2000, this area of the club was closed for remodeling. This relatively large primary restaurant is open to all members and their guests from Tuesday through Friday from 11:00 a.m. until 9:00 p.m. and Saturday from 8:00 a.m. until 9:00 p.m. Its days of operation are the same as the Men's Grille and the Ladies' Card Room and its hours of operation are more extensive. This grille was not open for services when Albright and LaFargue were denied access to and service from the Men's Grille.
Further, the facts of this case do not support the contention that the Men's Grille is a an area with privacy concerns. Although there was testimony that implied some men might have entered the Men's Grille dressed in a towel or merely not dressed at all, such a practice was in direct violation of the dress code for the Men's Grille which required casual but appropriate attire. Additionally, the room is often open to the public and used frequently by both sexes during the holiday seasons and for tournaments and private parties. During these events, a screen is erected clearly separating the men's locker room and blocking the view.
A policy of exclusion based on gender, which is instituted to cater to the whim or fancy of male patrons, is not reasonably related to a legitimate end and does, therefore, constitute arbitrary, capricious, or unreasonable discrimination based on gender if employed in a public facility or accommodation.
Accordingly, I find the plaintiffs adequately carried their burden of establishing arbitrary, capricious, or unreasonable discrimination based on gender in the club's Men's Grille policy of access.
NOTES
[1] Retired Judge Moon Landrieu, sitting ad hoc for Kimball, J., recused; Retired Judge Phillip C. Ciaccio, sitting ad hoc for Victory, J., recused; retired Judge Robert L. Lobrano, sitting ad hoc for Traylor, J., recused.
[2] In seeking access to this dining facility, plaintiffs assert their constitutional right to be free from "arbitrary, capricious, or unreasonable discrimination based on ... sex." La. Const. art. I, § 12 (1974).
[3] A fifth female resident of Caddo Parish, who was not a member, joined in the suit as a plaintiff.
[4] Albright v. Southern Trace Country Club of Shreveport, Inc., 37,725 (La.App. 2 Cir. 10/17/03), 859 So.2d 238.
[5] Albright v. Southern Trace Country Club of Shreveport, Inc., 03-3413 (La.3/26/04), 871 So.2d 331.
[6] Reed v. Reed, 404 U.S. 71, 73, 92 S.Ct. 251, 252-253, 30 L.Ed.2d 225 (1971) (Striking as unconstitutional an Idaho statutory provision that among equally qualified persons entitled to administer a decedent's estate, males must be preferred over females.)
[7] Kirchberg v. Feenstra, 450 U.S. 455, 462-463, 101 S.Ct. 1195, 1199-1200, 67 L.Ed.2d 428 (1981). Louisiana had statutorily terminated the "head and master" rule prior to this decision of the Supreme Court and substituted an equal management rule. See, 1979 La.Acts, No. 709 (effective Jan. 1, 1980), revising Book III, Title VI of the Louisiana Civil Code (Matrimonial Regimes).
[8] United States v. Virginia, 518 U.S. 515, 531, 116 S.Ct. 2264, 2274-2275, 135 L.Ed.2d 735 (1996). The majority opinion includes a compendium of commentaries and jurisprudence illustrating the evolution of women's rights from the days when the United States Constitution was new through 1996, when the Court held that the exclusion of women by the State of Virginia from the educational opportunities for military training and civilian leadership development provided by Virginia Military Institute (VMI) was unconstitutional.
[9] Roberts v. United States Jaycees, 468 U.S. 609, 625-626, 104 S.Ct. 3244, 3253-3254, 82 L.Ed.2d 462 (1984).
[10] Id.
[11] Cohens v. Virginia, 19 U.S. 264, 389, 6 Wheat. 264, 5 L.Ed. 257 (1821).
[12] Lee Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La. L.Rev. 1, 37 (1974).
[13] Id. at 38.
[14] Id. at 40.
[15] Id., at 40.
[16] See, Louis "Woody" Jenkins, A Selective Analysis of the Louisiana Constitution1974: The Declaration of Rights, 21 Loy.L.R. 9, 36 (1975).
[17] Further guidance in making the public-or-private determination is found in the 1988 legislation that established the Louisiana Commission on Human Rights, LSA-R.S. 51:2231, et seq. The purpose and intent of that legislation was, in part, to assure that Louisiana has appropriate legislation prohibiting discrimination in public accommodations sufficient to justify deferral to the state by federal authorities of civil rights cases and "to safeguard all individuals within the state from discrimination because of race, creed, color, religion, sex, age, disability, or national origin ... in connection with public accommodations." LSA-R.S. 51:2231(A). The definitions section of that legislation, LSA-R.S. 51:2232, provides in pertinent part:

(10) "Place of public accommodation, resort, or amusement" means any place, store, or other establishment, either licensed or unlicensed, which supplies goods or services to the general public or which solicits or accepts the patronage or trade of the general public, or which is supported directly or indirectly by government funds. However, a bona fide private club is not a place of public accommodation, resort, or amusement if its policies are determined solely by its members and its facilities or services are available only to its members and their bona fide guests.
Thus, the conclusion by the district court that Southern Trace is a place of public accommodation and not a private club is consistent with the provisions of Chapter 38 of Title 51 regarding the protected human rights of individuals.
[18] Despite the finality of the district court's finding on this issue, in an amicus curiae brief, the National Club Association continues to argue to this court that Southern Trace is a private club. Such a finding was effectively repudiated by the United States Supreme Court's holding in Roberts v. United States Jaycees, 468 U.S. 609, 636, 104 S.Ct. 3244, 3259, 82 L.Ed.2d 462 (1984) (Once an association chooses to enter the commercial marketplace its ability to discriminate on the basis of gender is limited.)
[19] Our review of the record reveals the "numerous occasions" were all pre-planned events such as receptions in connection with prestigious golf tournaments, wedding receptions, or holiday parties. The record does not indicate female members had the ability "upon advance scheduling" to use the Men's Grille for obtaining a meal after a round of golf or for entertaining a guest at a weekday lunch. On the contrary, unrefuted testimony apparently overlooked by the district court was that on occasions when women served on committees with men, committee meetings were relegated to the confines of the Ladies' Card Room even when the committee consisted of one woman and several men.
[20] This language is found in United States v. Virginia, 518 U.S. 515, 533-534, 116 S.Ct. 2264, 2276, 135 L.Ed.2d 735 (1996).
[21] There is scant jurisprudence involving assertions of rights pursuant to Section 12. No case has reached the issues we reach today.

In Becnel v. City Stores Company, 675 F.2d 731 (5th Cir.1982), female customers of six New Orleans department stores challenged the stores' practice of charging for alterations on clothing sold in the women's departments, but providing alterations free of charge on clothing sold in the men's departments. The court held that such practices did not violate the proscription against discrimination in access to public accommodations because the women were not denied "access." The rights they were asserting were not protected by Article I, § 12.
In Muslow v. A.G. Edwards & Sons, Inc., 509 So.2d 1012 (La.App. 2 Cir.), writ denied, 512 So.2d 1183 (1987), suit was brought by an individual against a brokerage firm for defamation, intentional infliction of mental suffering, assault, invasion of business interest, and refusal of right to inspect corporate records. Although the plaintiff alleged the defendants violated his civil rights based on the Louisiana Constitution, Article I, § 12 and federal law, the court held that if he was discriminated against, it was not on the ground of his belonging to any of the categories of persons protected by the cited provisions.
In Bonomo v. Louisiana Downs, Inc., 337 So.2d 553 (La.App. 2 Cir.1976), two persons who had been convicted in federal court of bookmaking brought action against the racetrack on allegations they were unconstitutionally excluded from the racetrack. Although the court based its decision on a determination that the purpose for the exclusion was reasonable, it is debatable whether consideration of Article I, § 12 was proper. The plaintiffs' suit was not brought on a charge of discrimination in access to public accommodations based on race, religion, national ancestry, age, sex, or physical condition.
[22] In its answer to plaintiffs' petition, Southern Trace admitted the following: 1) the women entered the Men's Grille and requested service; 2) the women were escorted from the Men's Grille; 3) the plaintiffs who are members have been denied entrance into the Men's Grille; 4) the Men's Grille is connected by an open hallway to the men's locker room; 5) on occasions, including December of 1999, the Men's Grille has been open to males and females; 6) on those occasions Southern Trace has placed a partition in the hallway between the Men's Grille and the men's locker room; and 7) Southern Trace's rules governing the use of the clubhouse are the best evidence of their contents. The only significant denial in Southern Trace's answer was a denial that Southern Trace is a public area, accommodation, or facility as defined in La. Const. art. I, § 12.

Other undisputed facts were established by the testimony of the witnesses. The general managers, Minkler and Walsh, testified they had discretion to allow the Men's Grille to be used simultaneously by men and women "as needed." Walsh stated there was no other reason for the men-only policy than the enjoyment of the men. The plaintiffs did not dispute the testimony of the developer, Ramsey, that Southern Trace was designed with single sex dining areas based on economic/market factors.
[23] Hornick v. Noyes, 708 F.2d 321 (7 Cir. 1983), cert. denied, 465 U.S. 1031, 104 S.Ct. 1295, 79 L.Ed.2d 696 (1984).
[24] Id. at n. 8.
[25] Id.
[26] See, Lee Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 37 (1974).
[27] There is evidence in the record that persons may purchase various levels of membership, such as tennis memberships or swimming memberships. The highest category is a golf membership, entitling the person to use all the facilities at Southern Trace.
[28] Cf. Roberts v. United States Jaycees, 468 U.S. 609, 625-626, 104 S.Ct. 3244, 3253-3254, 82 L.Ed.2d 462 (1984).
[29] This factual situation places the plaintiffs' case squarely within the "paradigmatic" public accommodation case described in, ironically, the case relied on by defendants, Hornick v. Noyes. In such a case,

the only personal interaction, and consequently the only locus of discrimination, is the "vertical" interaction between the proprietor of the motel, theater or restaurant (or his agent) who refuses to permit a minority traveler or patron to make use of the facilities; any allegedly discriminatory behavior is on the part of the defendant proprietor (or his agents, for whom he is responsible). The prejudices of other individuals are not at issueexcept in those cases in which the proprietor discriminated in order to avoid antagonizing white customers. Even in this fact situation, however, it is the defendant proprietor who makes the discriminatory decision "on the grounds of race, color, religion, or national origin"even if he is personally without prejudice and makes his decision for what he considers to be sound business reasons. [Citations omitted.]
Hornick, 708 F.2d at 324-325. The court went on to contrast the vertical interaction of a typical public accommodation case with the atypical but substantial "horizontal" interactions among the long-term residents at the YWCA whose antisemitic prejudices were allegedly the cause of plaintiff's eviction.
[30] See Allison-LeBlanc v. Department of Public Safety and Corrections, Office of State Police, 95,0295, p. 6 (La.App. 1 Cir.10/06/95), 671 So.2d 448, 452.
[31] Albright, 37,725 at 6, 859 So.2d at 242.
[32] See Levin v. Delta Air Lines, Inc., 730 F.2d 994, 998 (5th Cir.1984), citing Diaz v. Pan American World Airways, Inc., 442 F.2d 385, 388 (5th Cir.1971).
[33] We agree with the plaintiffs that there is no evidence in the record on appeal which reflects what the judge viewed at the facility. Therefore, any factual findings based on his tour of the facility are totally unsupported by the record.
[34] Albright, 37,725 at 6, 859 So.2d at 242.
[35] Based on the use of the conjunction "or," gender discrimination is prohibited whether "arbitrary" or "capricious" or "unreasonable." Generally, that which is arbitrary or capricious will also be unreasonable.
[36] Roberts v. United States Jaycees, 468 U.S. at 625, 104 S.Ct. at 3253.
[37] Orr v. Orr, 440 U.S. 268, 283, 99 S.Ct. 1102, 1113, 59 L.Ed.2d 306 (1979).
[1] Albright v. Southern Trace Country Club of Shreveport, 37,725, p. 4 (La.App. 2 Cir. 10/17/03), 859 So.2d 238, 241.