Thomas Francis **REBMAN** and Danny **Brandner, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**FOLLETT HIGHER EDUCATION GROUP, INC., Defendant.**

**Case No. 6:06–cv–1476–Orl–28KRS.**

United States District Court,
M.D. Florida,
Orlando Division.

Sept. 12, 2008.

in which used textbooks were bought and sold at Follett-operated bookstores.

This case is before the Court on the Motion for Summary Judgment (Doc. 99) filed by Follett, in response to which Plaintiffs have filed a Memorandum in Opposition (Doc. 102). Having considered the parties' submissions, the record, and pertinent law, the Court concludes that Follett's motion must be granted.

### I. Background

Follett operates bookstores on the various campuses of DBCC and has done so since 1985. (Pribyl Decl. ¶ 4).[3] The operation of these bookstores during the time period relevant to this case was governed by a single bookstore operating agreement ("Agreement") between DBCC and Follett. (*Id.*). Under the Agreement, Follett agreed to manage and operate the DBCC on-campus bookstores, while DBCC was entitled to collect a percentage of the stores' annual gross revenues as commission. One of Follett's specific duties under the Agreement was to purchase and sell used textbooks according to certain pricing provisions. For example, Section 9.2(c) dictates that Follett will sell used textbooks for "not more than 75% of the new textbook selling prices." (Ex. D to Def.'s Notice of Filing, Doc. 100, at 7). Similarly, Section 9.4 of the Agreement states that "Follett shall purchase used textbooks adopted for the next academic term in quantities sufficient to meet course re-

Marc A. Wites, Wites & Kapetan, P.A., Lighthouse, Point, FL, Robert S. Thurlow, Robert S. Thurlow, P.A., New Smyrna Beach, FL, for Plaintiffs.

Sanford L. Bohrer and Scott D. Ponce, Holland & Knight, LLP, Miami, FL, for Defendants.

### ORDER

JOHN ANTOON, II, District Judge.

Plaintiffs Thomas Francis Rebman and Danny Brandner bring this putative class action[1] against Follett Higher Education Group, Inc. ("Follett"), a nationwide bookstore provider, for breach of contract, violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and civil conspiracy. Rebman and Brandner, students at Daytona Beach Community College ("DBCC"),[2] contend that they and other students were routinely overcharged and underpaid in relation to transactions

---

**1.** Plaintiffs' Motion for Class Certification (Doc. 72) was denied without prejudice and with leave to refile after the resolution of the pending motion for summary judgment. (Doc. 110).

**2.** DBCC was originally named as a defendant in the suit, but the parties later stipulated to a voluntary dismissal of all claims against the college. (Doc. 62).

**3.** Brandner and Rebman's evidentiary objections to the declarations submitted by Follett in support of its motion for summary judgment (Ex. C to Pl.'s Notice of Filing, Doc. 103) have been noted; however, none of the contested portions of these declarations were relevant to the Court's ruling on the motion for summary judgment. Consequently, the Court voices no opinion as to the merits of these objections.

quirements at not less than 50% of the retail price." (*Id.*).

Both Gary Shapiro, Senior Vice President of Intellectual Properties for Follett, and Jill McCollum, Follett's Manager of Course Materials, testified at their depositions that a common pricing procedure in the bookstore industry is to round up used textbook prices to the next higher chosen increment, i.e., $0.05, $0.10 or $0.25. (Shapiro Dep. at 21–22; McCollum Dep. at 15). Although there is no provision in the Agreement either permitting or prohibiting such rounding practices (McCollum Dep. at 56), it is common practice at the DBCC bookstores operated by Follett to round up the prices of used textbooks to the nearest $0.25 increment (*Id.* at 15; Shapiro Dep. at 53–54). According to McCollum, this particular procedure has been in place at DBCC bookstores since at least 1998. (McCollum Dep. at 15). Follett applies a similar rounding procedure to transactions in which it purchases used textbooks from students. Since at least 2005, Follett has rounded the buyback prices of used textbooks up or down (whichever is closest) to the nearest $0.25 increment. (*Id.* at 21). If the price of a used textbook, either for sale or buyback purposes, is already an even $0.25 increment, no rounding occurs. (*Id.* at 16–18).

Both representative plaintiffs in this action were affected by Follett's rounding procedures. On June 13, 2006, Plaintiff Rebman sold three of his used textbooks to Follett at a DBCC bookstore. (McCollum Decl. ¶¶ 2–3; Doc. 102 at 5). For two of those textbooks, the buyback price was rounded down to the nearest $0.25 increment, resulting in a payment to Rebman of less than 50% of the retail value of those textbooks.[4] (McCollum Dep. at 55–56, 57–58). The sale of the third used textbook resulted in a payment of exactly 50% of the retail price of a new textbook, as no rounding was necessary in that instance. (*Id.* at 58; McCollum Decl. ¶ 9).

Approximately two months later, on August 18, 2006, Plaintiff Brandner purchased a used copy of *College Algebra* from a DBCC store operated by Follett. (McCollum Decl. ¶ 12; Doc. 102 at 4–5). On that day, the selling price of a new copy of the textbook was $118.25. (McCollum Dep. at 48). After the price of his used copy had been rounded to the next highest $0.25 increment, Brandner paid $88.75 for the textbook, $0.07 more than 75% of the new textbook selling price. (*Id.* at 48–9).

## II. Discussion

### A. Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). However,

---

4. On that day, the retail price of a new copy of *College Algebra* was $112.75. (McCollum Decl. ¶ 7). Rebman was paid only $56.25 for his used copy of *College Algebra*. $0.12 less than 50% of the retail price. (*Id.*). Similarly, the retail price of a new copy of *Essential Biology with Physiology and Study Guide* was $103.25; however, Rebman was paid only $51.50 for his used copy, $0.12 less than 50% of the retail price. (*Id.* ¶ 8).

summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.,* 131 F.3d 995, 999 (11th Cir.1997).

### B. The Merits of Follett's Motion

### 1. Breach of Contract Claims (Counts I and III)

 In Count I of the Complaint, Brandner and Rebman allege that Follett breached Section 9.2(c) of the Agreement by charging customers who purchased used textbooks from the bookstore more than 75% of the selling price of new textbooks. Count III of the Complaint sets forth a similar breach of contract claim, alleging that Follett breached Section 9.4 of the Agreement by paying customers who sought to sell their used books back to the bookstores less than 50% of the retail value of the textbook. Follett seeks summary judgment on both of these claims.

In support of its motion, Follett advances the following four arguments: (1) Brandner and Rebman are not third-party beneficiaries of the Agreement and therefore have no standing to sue for breach of contract; (2) Brandner and Rebman have no standing to sue on the Agreement because it is a government contract that does not explicitly grant third-party rights to sue; (3) even if Brandner and Rebman are entitled to sue on the Agreement, they are impermissibly seeking to enforce rights that exceed the rights of the parties to enforce the Agreement; and (4) alter-natively, the pricing provisions of the Agreement were modified by the parties' subsequent mutual course of dealing and therefore were not violated by the rounding procedures instituted at the bookstores.

 In this case, the threshold issue with regard to Brandner and Rebman's breach of contract claims is whether Brandner and Rebman, as non-parties to the Agreement, are nonetheless entitled to sue as third-party beneficiaries. The question of whether a non-party to a contract can maintain an action on the contract as a third-party beneficiary is a matter of state law. *Bochese v. Town of Ponce Inlet,* 405 F.3d 964, 981 (11th Cir. 2005). Florida recognizes a non-party's right to sue on a contract only where that party was an intended beneficiary of the contract; non-parties who receive merely an incidental or consequential benefit from a contract have no right to its enforcement. *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.,* 647 So.2d 1028, 1031–32 (Fla. 4th DCA 1994). A non-party is an intended third-party beneficiary "only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong." *Id.* at 1032. "To find the requisite intent, it must be established that the parties to the contract actually and expressly intended to benefit the third party; it is not sufficient to show only that one of the contracting parties unilaterally intended some benefit to the third party." *Biscayne Inv. Group, Ltd. v. Guarantee Mgmt. Servs., Inc.,* 903 So.2d 251, 254 (Fla. 3d DCA 2005).

Follett claims that Brandner and Rebman cannot establish that the Agreement's used textbook pricing provisions were "clearly" intended to "primarily and directly" benefit the bookstores' customers. In

this regard, Follett maintains that the Agreement neither expressly names nor references the bookstores' customers as third-party beneficiaries. Follett further contends that the evidence Brandner and Rebman rely upon in support of their claim to third-party-beneficiary status is "precisely [the] type of circumstantial evidence from which a specific intent to benefit a third party cannot be inferred." (Doc. 99 at 17).

Brandner and Rebman respond that limiting the prices at which used textbooks can be bought and sold at the bookstore cannot possibly benefit Follett or DBCC because the limitations restrict both parties' abilities to maximize income through revenues generated at the bookstores. Therefore, Brandner and Rebman reason, the price limitations can only have been intended to benefit bookstore customers. In support of this assertion, Brandner and Rebman offer the deposition testimony of Gary Shapiro, Follett's Senior Vice President of Intellectual Properties, in which the following exchange between Plaintiffs' counsel and Mr. Shapiro took place:

Q. Before we get to the second part of that calculation or the rounding, you mentioned in your answer that there are situations where the bookstore wants to buy back all possible books and there were several reasons for that. What are those reasons?

A. *Customer service, primarily. It—it is a great thing to do for students. Students like buying back. It's a— so it's a strong customer satisfaction issue. It also is economically good for Follett because there's no freight costs involved in that. Having used books—used books sell better than new books because of Internet competition. So if you have a used book at a lower price* than a new book, you'll sell it. So there's—there's a lot of reasons why used books are good to have.

Q. Why is it a great thing for students?

A. Because they get half of what they paid back.

Q. They get more money for the book?

A. Yeah. They get money, number one, and then they get more money, number two. So the difference between buying guide price and half price can be substantial. Sometimes it's not. It just depends on the book, but it can be substantial. But it's also in the store's best interest to buy as many as possible, so we do. We train to that. We encourage that. We benchmark it.

(Shapiro Dep. at 64–65). In Brandner and Rebman's view, Mr. Shapiro's comments about the customer service aspects of Follett's participation in the used textbook buyback program, along with the terms of the contract, show that "[t]he *only* parties interested in [the pricing provisions] are the buyers and sellers of used textbooks— primarily students." (Doc. 102 at 4). At the very least, Brandner and Rebman maintain, the evidence shows that there remains a disputed issue of material fact as to the parties' intent to benefit the bookstore customers.

The Court agrees with Follett; Brandner and Rebman have failed to uphold their obligation to submit specific factual evidence to support their claim to third-party-beneficiary status. The parties concur that the Agreement neither specifically identifies nor references the bookstore customers. Thus, it was Brandner and Rebman's duty to submit factual evidence outside the confines of the Agreement as to the parties' mutual intent to benefit customers buying and selling used textbooks. Unfortunately, no such evidence

came to light. The excerpt of Mr. Shapiro's deposition testimony upon which Brandner and Rebman rely does little to support their cause. Indeed, it is apparent from the context of that excerpt that Mr. Shapiro was merely making general comments regarding the reasons for buying back used textbooks from students in large quantities. Mr. Shapiro voiced no opinion about why Follett specifically contracted to buy used textbooks at no less than 50% of the retail price. Furthermore, other than customer service, Mr. Shapiro identified two other reasons that the stores offer to buy back used books from students—savings on freight charges and aid in Internet competition—both of which directly benefit Follett and DBCC, not the bookstores' customers. Consequently, Mr. Shapiro's testimony is not the type of clear expression of intent required to confer third-party-beneficiary status upon Brandner and Rebman.

The remainder of Brandner and Rebman's response to the motion for summary judgment on the contract claims amounts to pure conjecture. Brandner and Rebman's unsupported belief that the pricing provisions solely benefit bookstore customers because they cannot possibly benefit anyone else is poorly reasoned. Admittedly, and as suggested by Brandner and Rebman, the bookstores' customers may ultimately benefit financially from the Agreement's restrictions on used textbook pricing; however, it is likely that Follett and DBCC reap benefits from these restrictions, too. For example, it is entirely possible that Follett, in its business experience, concluded that limiting pricing on used textbooks actually draws more students into the bookstores to buy and sell their textbooks, thereby generating additional revenue. Alternatively, the pricing provisions could have been added into the contract as a way for Follett to explicitly assure DBCC that its on-campus bookstores would remain competitive in the used textbook trade and continue to generate corresponding revenues. In turn, DBCC had a substantial interest in the overall success of the Follett bookstores, given that the size of its commission directly depended on the amount of store revenues.

Thus, there is more than one reasonable explanation for why Follett and DBCC contracted to restrict the prices of used textbooks. Brandner and Rebman have not produced any specific factual evidence demonstrating that the clear intent of the parties in this instance was to primarily and directly benefit bookstore customers, and not the parties themselves. Furthermore, Brandner and Rebman cannot defeat Follett's motion by merely relying on their belief or opinion as to the parties' intent. *LaRoche v. Denny's, Inc.*, 62 F.Supp.2d 1366, 1371 (S.D.Fla.1999) ("The law is clear ... that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment."). Therefore, because Brandner and Rebman have failed to raise a genuine issue of material fact with respect to whether they are third-party beneficiaries of the Agreement's used textbook pricing restrictions, they are not entitled to continue to pursue their third-party breach of contract claims any further. Consequently, summary judgment must be awarded in favor of Follett on Counts I and III of the Complaint.

### 2. FDUTPA Claims (Counts II and IV)

In Counts II and IV, Brandner and Rebman allege that Follett's rounding practices with respect to both the sale and purchase of used textbooks constitute unfair and deceptive trade practices, in violation of the Florida Deceptive and Unfair Trade Practices Act, sections 501.201–.213,

Florida Statutes. The Act declares unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat. "A practice is unfair under FDUTPA if it offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F.Supp.2d 1134, 1145 (M.D.Fla.2007). "[A] deceptive practice is one that is 'likely to mislead' consumers." *Davis v. Powertel, Inc.*, 776 So.2d 971, 974 (Fla. 1st DCA 2000). Furthermore, FDUTPA "applies to private causes of action arising from single unfair or deceptive acts in the conduct of any trade or commerce, even if it involves only a single party, a single transaction, or a single contract." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003).

In seeking summary judgment on Brandner and Rebman's FDUTPA claims, Follett asserts that these claims are an "impermissibl[e] attempt[ ] to convert breach of contract claims into claims for alleged violations of FDUTPA." (Doc. 99 at 18). Follett indicates that Brandner and Rebman do not challenge the act underlying the breach, i.e., Follett's rounding practice, but rather only challenge the act of breaching of the Agreement as unfair or deceptive. In Follett's view, Brandner and Rebman cannot rely solely on a violation of the Agreement as a basis for assertion of a FDUTPA claim.

■■■ Florida law does not prohibit Brandner and Rebman from pursuing a separate FDUTPA claim related to Follett's alleged breach of the Agreement, so long as the act giving rise to the breach also constitutes an alleged unfair or deceptive trade practice. *PNR*, 842 So.2d at 777 n. 2 ("To the extent an action giving rise to

a breach of contract or breach of lease may also constitute an unfair or deceptive act, such a claim is and has always been cognizable under the FDUTPA."). In this instance, the Court agrees with Follett's assessment of the FDUTPA claims; Brandner and Rebman do not challenge Follett's rounding practices *per se*; instead, they challenge them only to the extent that rounding leads to a used textbook price that is inconsistent with the express terms of the Agreement. In other words, Brandner and Rebman challenge the act of breaching the Agreement as unfair or deceptive rather than the act giving rise to the breach. This is precisely the type of breach of contract claim that cannot be converted to a claim under FDUTPA. *See PNR*, 842 So.2d at 777 n. 2 ("[T]his opinion does not operate to convert every breach of contract or breach of lease case into a claim under the Act. indeed, such a construction would be precluded by the FDUTPA, which only reaches conduct that is unfair or deceptive as judged by controlling case law.").

In order to assert proper FDUTPA claims, Brandner and Rebman must have shown that the *acts underlying* the breach of contract are, by themselves, unfair or deceptive. They have not done so here. Indeed, Brandner and Rebman have failed to offer any factual evidence or cite any legal authority for the proposition that Follett's practice of pricing used textbooks for sale at more than 75% of the new retail price, and pricing used textbooks for buy-back at less than 50% of the new retail price, is likely to mislead consumers or "offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Furmanite Am., Inc.*, 506 F.Supp.2d at 1145. Instead, Brandner and Rebman merely rely on the unsupported allegations in their complaint to defend against Fol-

lett's attack. Mere allegations cannot defeat a properly supported motion for summary judgment. Fed.R.Civ.P. 56(e); *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."). Therefore, Follett's motion for summary judgment as to Counts II and IV must be granted.

#### 3. Civil Conspiracy Claim (Count V)

■ In Count V of the Complaint, Brandner and Rebman allege that Follett and DBCC conspired to underpay customers for their used textbooks to both increase Follett's profit margins and consequently increase the amount of commission collected by DBCC. Follett seeks summary judgment on this claim, contending that because the underlying breach of contract and FDUTPA claims fail, so must the civil conspiracy claim. Indeed, a claim for conspiracy requires an actionable underlying tort or wrong. *Raimi v. Furlong,* 702 So.2d 1273, 1284 (Fla. 3d DCA 1997); *Wright v. Yurko,* 446 So.2d 1162, 1165 (Fla. 5th DCA 1984). As summary judgment has been awarded to Follett on each of Brandner and Rebman's underlying claims, the civil conspiracy claim now has no leg left to stand on. Summary judgment must be awarded to Follett on Count V.

#### III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment (Doc. 99) is **GRANTED** as to all of Plaintiffs' claims.

2. The Clerk is directed to enter judgment in favor of Defendant in accordance with this Order. Thereafter, the Clerk shall close this file.